IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re<br>Horizon Group Management, LLC,<br>　　　　　　　　　　　　　Debtor.<br><br>Andrew J. Maxwell, trustee,<br>　　　　　　　　　　　　　Plaintiff,<br>v.<br><br>Daniel Michael, *et al.*,<br>　　　　　　　　　　　　　Defendants. | Chapter 7<br><br>Case No. 14-41230<br><br>Hon. Timothy A. Barnes<br><br>Adv. Proc. No. 16-00394 |

**THE MICHAEL DEFENDANTS' RESPONSE TO
PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
AND THE MICHAEL DEFENDANTS' STATEMENT OF ADDITIONAL FACTS**

Pursuant to Local Rule 7056-2(A)(2), the Michael Defendants[1] hereby respond to the Statement of Undisputed Facts filed by Andrew J. Maxwell, Chapter 7 trustee for the estate of Horizon Group Management, LLC (the "Trustee"), as follows:

**Responses to Plaintiff's Statement of Undisputed Facts -- Local Rule 7056(A)(2)(a)**

1. The Trustee is the duly appointed and acting trustee in this case under Chapter 7 of the United States Bankruptcy Code. *Defendant's Answer and Affirmative Defenses to Third Amended Complaint* [ECF No. 95] ¶15 (hereinafter "Horizon Group Answer").

**RESPONSE:** Admitted.

2. Daniel Michael ("Daniel") is an individual and citizen of the state of Florida. Horizon Group Answer ¶ 17.

**RESPONSE:** Admitted.

---

[1] The Michael Defendants consist of Daniel Michael ("Daniel"), the Daniel Michael Living Trust u/t/a/d Match 4, 1998 (the "Michael Trust"), Martha Michael ("Martha"), Jeffrey Michael ("Jeffrey"), Horizon Group Realty Holdings, LLC ("Horizon Holdings"), and each of the Horizon Group I - XI and XV - XXIV (the "Horizon Property Owners").

-1-

3. Martha Michael ("Martha") is an individual and citizen of the state of Florida and Daniel's wife. Horizon Group Answer ¶ 19.

**RESPONSE:** Admitted.

4. Daniel acquired, owned, and managed a sizable portfolio of residential apartment buildings (the "Properties"), through companies directly or indirectly owned by him. Horizon Group Answer ¶ 1.

**RESPONSE:** Admitted.

5. The Debtor is an Illinois limited liability company that was engaged in the residential real property management business. Horizon Group Answer ¶ 16.

**RESPONSE:** Admitted.

6. Daniel is the sole Manager of and a person in control of the Debtor. Horizon Group Answer ¶¶ 1, 17, 51.

**RESPONSE:** Admitted.

7. The Daniel Michael Living Trust u/t/a/d March 4, 1998, is the sole general and limited member of the Debtor. Horizon Group Answer ¶¶ 1,18, 51.

**RESPONSE:** Admitted.

8. Daniel is the trustee of the Daniel Michael Living Trust u/t/a/d March 4, 1998, an *inter vivos* Illinois trust (the "Daniel Trust"). Horizon Group Answer ¶ 18.

**RESPONSE:** Admitted.

9. The Debtor was the sole and exclusive property manager for the hereinafter defined "Horizon Group Companies" and the Properties from 2000 to 2015. Horizon Group Answer ¶¶ 1, 17.

**RESPONSE:** The Michael Defendants admit the substance of this fact, however, the

Michael Defendants deny that Horizon Group Answer ¶¶ 1, 17 support this factual allegation. *But see* Horizon Group Answer ¶ 48.

10. Jeffrey is an individual and a citizen of the state of Illinois. Horizon Group Answer ¶ 20.

**RESPONSE:** Admitted.

11. Jeffrey is the son of Daniel and Martha. *Horizon Group Answer ¶20.*

**RESPONSE:** Admitted.

12. As of May 2001, the Debtor employed Jeffrey as its COO and general counsel. Horizon Group Answer ¶ 20.

**RESPONSE:** Admitted.

13. Horizon Group I, LLC is an Illinois limited liability company organized on or about November 26, 1997, that holds legal title to certain residential real property commonly known as 1938-50 West Lawrence, Chicago, Illinois. Horizon Group Answer ¶ 21.

**RESPONSE:** Admitted.

14. Horizon Group II, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 901 West Argyle, Chicago, Illinois. Horizon Group Answer ¶ 22.

**RESPONSE:** Admitted.

15. Horizon Group III, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 1901-09 West Wilson, Chicago, Illinois. Horizon Group Answer ¶ 23.

**RESPONSE:** Admitted.

16. Horizon Group IV, LLC is an Illinois limited liability company organized on or

about March 26, 1998, that holds legal title to certain residential real property commonly known as 722-726 West Barry, Chicago, Illinois. Horizon Group Answer ¶ 24.

**RESPONSE:** Admitted.

17.     Horizon Group V, LLC (formerly known as Lawrence Maplewood, LLC), Illinois Secretary of State file no. 03457532, is an Illinois limited liability company organized on or about March 8, 2011, that may hold legal title to certain residential real property commonly known as 4759 North Maplewood, Chicago, Illinois. Horizon Group Answer ¶ 25.

**RESPONSE:** Admitted.

18.     Horizon Group VI, LLC is an Illinois limited liability company organized on or about March 26, 1998, that holds legal title to certain residential real property commonly known as 5650 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 26.

**RESPONSE:** Admitted.

19.     Horizon Group VII, LLC is an Illinois limited liability company organized on or about December 29, 1999, that holds legal title to certain residential real property commonly known as 910-18 West Dakin, Chicago, Illinois. Horizon Group Answer ¶ 27.

**RESPONSE:** Admitted.

20.     Horizon Group VIII, LLC is an Illinois limited liability company organized on or about November 9, 2000, that holds legal title to certain residential real property commonly known as 100 Fellows Court, Elmhurst, Illinois. Horizon Group Answer ¶ 28.

**RESPONSE:** Admitted.

21.     Horizon Group IX, LLC is an Illinois limited liability company organized on or about August 29, 2001, that holds legal title to certain residential real property commonly known as 525 West Oakdale, Chicago, Illinois. Horizon Group Answer ¶ 29.

**RESPONSE:** Admitted.

22. Horizon Group X, LLC, f/k/a Horizon Development, LLC, is an Illinois limited liability company organized on or about March 8, 2000, that holds legal title to certain residential real property commonly known as 4242 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 30.

**RESPONSE:** Admitted.

23. Horizon Group XI, LLC is an Illinois limited liability company organized on or about December 12, 2003, that holds legal title to certain residential real property commonly known as 5017 North Wolcott, Chicago, Illinois. Horizon Group Answer ¶ 31.

**RESPONSE:** Admitted.

24. Horizon Group XV, LLC is an Illinois limited liability company organized on or about December 17, 2003, that holds legal title to certain residential real property commonly known as 1828-38 West Lawrence, Chicago, Illinois. Horizon Group Answer ¶ 32.

**RESPONSE:** Admitted.

25. Horizon Group XVI, LLC is an Illinois limited liability company organized on or about December 17, 2003, that holds legal title to certain residential real property commonly known as 1956-60 West Lawrence, Chicago, Illinois. Horizon Group Answer ¶ 33.

**RESPONSE:** Admitted.

26. Horizon Group XVII, LLC is an Illinois limited liability company organized on or about October 7, 2004, that holds legal title to certain residential real property commonly known as 6401 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 34.

**RESPONSE:** Admitted.

27. Horizon Group XVIII, LLC is an Illinois limited liability company organized on or

about March 2, 2005, that holds legal title to certain residential real property commonly known as 6040 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 35.

**RESPONSE:** Admitted.

28. Horizon Group XIX, LLC is an Illinois limited liability company organized on or about March 9, 2006, that holds legal title to certain residential real property commonly known as 6725 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 36.

**RESPONSE:** Admitted.

29. Horizon Group XX, LLC is an Illinois limited liability company organized on or about December 8, 2006, that holds legal title to certain residential real property commonly known as 4600 North Clarendon, Chicago, Illinois and 822 West Wilson, Chicago, Illinois. Horizon Group Answer ¶ 37.

**RESPONSE:** Admitted.

30. Horizon Group XXI, LLC is an Illinois limited liability company organized on or about June 26, 2009, that holds legal title to certain residential real property commonly known as 4601-13 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 38.

**RESPONSE:** Admitted.

31. Horizon Group XXII, LLC is an Illinois limited liability company organized on or about May 3, 2011, that holds legal title to certain residential real property commonly known as 5050 North Sheridan, Chicago, Illinois. Horizon Group Answer ¶ 39.

**RESPONSE:** Admitted.

32. Horizon Group XXIII, LLC is an Illinois limited liability company organized on or about July 9, 2012, that holds legal title to certain residential real property commonly known as 1605-31 Chicago Avenue, Evanston, Illinois. Horizon Group Answer ¶ 40.

**RESPONSE:** Admitted.

33. Horizon Group XXIV, LLC is an Illinois limited liability company organized on or about November 22, 2013, that holds legal title to certain residential real property commonly known as 6119 North Kenmore, Chicago, Illinois. Horizon Group Answer ¶ 41.

**RESPONSE:** Admitted.

34. The entities described in paragraphs 13 through 33 are hereinafter collectively referred to as the "Horizon Group Companies," and the residential real property they own are collectively referred to as the "Properties."

**RESPONSE:** The Michael Defendants admit that the Trustee has constructed the definitions provided in paragraph 34.

35. Horizon Group Realty Holdings, LLC ("Holdings") is an Illinois limited liability company organized on June 5, 2009. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

36. Daniel is the sole manager of Holdings. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

37. On or about June 5, 2009, Daniel, as manager and on behalf of Holdings, and the original members of Holdings – the Daniel Trust (24.13%); Martha Michael ("Martha"), not individually, but solely as trustee of the Martha Michael Living Trust dated March 4, 1998 ("Martha Trust") (23.07%); Daniel Michael, not individually but solely as trustee of David S. Michael Irrevocable Trust dated June 9, 2004 (16.60%); Jeffrey E. Michael, not individually but solely as trustee of the Jeffrey E. Michael Revocable Trust dated July 4, 2002 (16.60%); Daniel Michael, not individually, but solely as trustee of the Tracy H. Michael Irrevocable Trust dated June 9, 2004 (16.60%); David S. Michael, individually (1%); Jeffrey E. Michael, individually

(1%); and Tracy H. Wolfe, individually (1%) – executed an operating agreement for Holdings. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

38. All the members of Holding are Daniel and Martha's trusts; Daniel and Martha's children; or Daniel and Martha's children's trusts. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

39. At or shortly after its organization, Holdings replaced Daniel as the manager of the then existing Horizon Group Companies and became the initial manager of all the Horizon Group Companies that were organized after Holdings' organization. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

40. At or shortly after Holdings organization, Daniel transferred his membership interests in all the then-existing Horizon Group Companies to Holdings, and Holdings became the initial member of all the Horizon Group Companies that were organized after Holdings' organization. Horizon Group Answer ¶ 43.

**RESPONSE:** Admitted.

41. At all times relevant to this action, the Daniel Trust owned all the membership interests of the Debtor. Horizon Group Answer ¶ 51.

**RESPONSE:** Admitted.

42. The Debtor owned no real property and had no business other than providing financial and property management services to the Horizon Group Enterprise. Horizon Group Answer ¶ 54.

**RESPONSE:** The Michael Defendants admit that the Debtor did not own real property and that its business consisted of providing financial and property management services to the

Horizon Property Owners. The Trustee does not define "Horizon Group Enterprise" and thus the Michael Defendants deny the statements in Paragraph 42 relating to the "Horizon Group Enterprise."

43. On January 1, 2004, the Debtor and certain of the Horizon Group Companies entered the first of a series of written management agreements. Horizon Group Answer ¶ 55.

**RESPONSE:** Admitted.

44. On January 1, 2008, the Debtor and the then existing Horizon Group Companies, as "Owner," entered an *Amended & Restated Management Agreement*. A copy of the *Amended & Restated Management Agreement* is attached to the Third Amended Complaint as Exhibit 2. *Third Amended Complaint* [ADV ECF No.78-2]; Horizon Group Answer ¶ 55.

**RESPONSE:** Admitted.

45. On July 1, 2009, the Debtor and all the then existing Horizon Group Companies executed the *First Amendment to the Amended & Restated Management Agreement*, which added additional "Owner" entities as parties. *A copy of the First Amendment to the Amended & Restated Management Agreement* is attached to the Third Amended Complaint as Exhibit 3. *Third Amended Complaint* [ADV ECF No. 78-3]; Horizon Group Answer ¶ 55.

**RESPONSE:** Admitted.

46. *The Amended and Restated Management Agreement* and the *First and Second Amendments* were executed by Daniel as manager of the Debtor on behalf of the Debtor and Daniel as manager on behalf of each of the then existing Horizon Group Companies. Horizon Group Answer ¶ 56.

**RESPONSE:** Admitted.

47. On December 1, 2009, the Debtor and all the then existing Horizon Group

Companies executed the *Second Amendment to the Amended & Restated Management Agreement*, which amended Article XIII, "Compensation and Expenses," and Article XVI, "Termination," of the *Amended & Restated Management Agreement*. A copy of the *Second Amendment to the Amended & Restated Management Agreement* is attached Third Amended Complaint as Exhibit 4. *Third Amended Complaint* [ADV ECF No. 78-4]; Horizon Group Answer ¶ 59.

**RESPONSE:** The Debtor's management agreements are the best evidence of their terms. The Michael Defendants deny all of the allegations about those agreements that are inconsistent with the terms of those agreements.

60. As of December 1, 2011, the Debtor and the Horizon Group Companies entered a *Second Amended & Restated Management Agreement*. A copy of the *Second Amended & Restated Management Agreement* is attached the Third Amended Complaint as Exhibit 5. *Third Amended Complaint* [ECF No. 78-5]; Horizon Group Answer ¶ 64.

**RESPONSE:** Admitted.

48. The *Second Amended & Restated Management Agreement* was executed by Daniel as manager of the Debtor and Holdings as manager of each of the then existing Horizon Group Companies, by Daniel as manager of Holdings. Horizon Group Answer ¶ 64.

**RESPONSE:** Admitted.

49. As of December 1, 2013, the *Second Amended & Restated Management Agreement* was amended solely to add additional Horizon Group Companies as parties. A copy of the *Amended & Restated Management Agreement* is attached hereto and incorporated in Third Amended Complaint as Exhibit 6. *Third Amended Complaint* [ADV ECF No. 78-6-]; Horizon Group Answer ¶ 64.

**RESPONSE:** Admitted.

50. On November 14, 2014 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11, Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Illinois. [ECF No. 1]; Horizon Group Answer ¶ 256.

**RESPONSE:** Admitted.

51. The Debtor operated its business and managed its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code Horizon Group Answer ¶ 257.

**RESPONSE:** Admitted.

52. On February 27, 2015, the Debtor filed its Motion to Authorize (1) Sale of Substantially all of its Assets Free and Clear of Liens, Claims, and Interests, (2) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (3) Related Relief (the "Sale Motion"). [ECF No. 49]. Horizon Group Answer ¶ 282.

**RESPONSE:** Admitted.

53. On April 2, 2015, the Court entered its Order (the "Sale Order") authorizing the sale of substantially all of Debtor's assets and the assumption and assignment of certain executory contracts, primarily the Management Agreement with the Horizon Group Companies to HRG Management, LLC, an Illinois limited liability company of which Jeffrey is the sole member and manager. [ECF No. 64]; Horizon Group Answer ¶ 285.

**RESPONSE:** The Michael Defendants admit that on April 1, 2015, the Court entered the Sale Order, which is the best evidence of its terms. The Michael Defendants deny all of the allegations that are inconsistent with the terms of the Sale Order. The Michael Defendants further admit that Jeffrey Michael was the sole member and manager of HRG Management, LLC.

**The Michael Defendants' Statement of Additional Facts**

1. The Trustee's proposed expert—Michael Pakter[2]—did not perform a valuation of the Debtor's assets at any point in time.[3] *See* Expert Rebuttal Report of Melissa S. Kibler ("Kibler Rebuttal Report") at ¶ 30, attached hereto as Exhibit B. Further, he failed to appropriately distinguish the premise of value that would have been appropriate, relying solely on the liquidation value achieved in bankruptcy rather than the going concern value that could have been achieved in a sale of the assets during the preceding four years. *Id.*

2. Ms. Kibler performed a valuation of the Debtor's assets as of December 31, 2022; December 31, 2012; February 22, 2013 (the day the State Court announced that it would conditionally grant Ms. Bonnen's motion for class certification); July 12, 2013 (the day the Appellate Court entered its order denying the Debtor's petition for leave to appeal class certification); December 31, 2013; and August 26, 2014 (the day prior to the State Court's award of Class Counsel's fees). Kibler Rebuttal Report, at ¶ 31.

3. The standard of value is fair market value. Kibler Rebuttal Report, at ¶ 31(a); *see also* transcript of Deposition of Melissa Kibler ("Kibler Dep."), at 63:1-8, attached hereto as Exhibit C. Fair market value is defined by the Internal Revenue Service as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Kibler Rebuttal Report, at ¶ 31(a). The IRS Revenue Ruling 59-60 also states that, "in addition . . . the hypothetical buyer and seller are assumed to be able, as well as willing, to trade an to be well informed about the property and the market for such

---

[2] Mr. Pakter's Expert Report (the "Pakter Report") is attached hereto as Exhibit A.
[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Kibler Rebuttal Report.

property." *Id.*

4. The premise of value is going concern, which reflects the highest and best use of the Debtor's assets. *Id.* at ¶ 31(b). Going concern value is the value of a business enterprise that is expected to continue to operate in the future; the intangible elements of going concern value result from facts such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place. *Id.*; *see also* Kibler Dep. at 48:4-7; 57:16-21.

5. The above-described definition of fair market value relies on the presumption of a market test or other means to inform both buyer and seller regarding the value of the property. However, in the case of the Debtor's bankruptcy sale, no broker or investment banker was hired, and no such market test was performed. *See* Kibler Rebuttal Report, at ¶ 32; *see also* Kibler Dep. at 40:5-10.

6. The circumstances and condition of the business were very different in February 2015 when the Debtor filed its motion to sell all of its assets. *See* Kibler Rebuttal Report, at ¶ 33. Once the State Court awarded Class Counsel's fees, Horizon Management no longer had sufficient resources to meet its fixed, liquidated obligations and thus faced an existential threat to its ongoing operation. *Id.*; *see also* Kibler Dep. at 53:11-22. Prior to that time, however, the Debtor conducted its business and paid its debts in the ordinary course. As such, a going concern premise of value is appropriate. *See also* Kibler Rebuttal Report, at ¶ 33.

7. In concluding that there was no difference between going concern and liquidation value, Mr. Pakter failed to account for the value of the Debtor's intangible assets, including its workforce in place and its management agreement with the Horizon Property Owners. *Id.* at ¶ 34.

8. As of November 24, 2014, the Debtor had over 90 employees, including many who were assigned to specific properties. *Id.* at ¶ 35. In 2011 and 2012, the payroll expense for

property-level employees was reflected in the Debtor's income statement and reimbursed through the management fee. *Id.*

9. Beginning in 2013, the Debtor began reflecting the payroll expense for property-level employees directly at the properties to which they were assigned. *Id.* Payroll expenses incurred in connection with the executive, office and administrative staff continued to be recorded at the Debtor. *Id.*

10. In either case, the employees who oversaw the operation of the property management company as well as those with day-to-day property management responsibilities were part of the Debtor's workforce and were critical to the Debtor's ability to generate revenue and cash flow. *Id.*

11. On December 1, 2011, the Debtor entered into the Second Amended & Restated Management Agreement with the Horizon Property Owners (as subsequently amended, the "Management Agreement"). *Id.* at ¶ 36. On December 1, 2013, this agreement was amended solely to add additional Horizon Property Owners, Horizon Group XXII - XXIV and Lawrence Maplewood, LLC n/k/a Horizon Group V. *Id.*

12. Mr. Pakter states in his report that, ". . . in its Motion to Authorize Sale, the Debtor admitted that because of the 'at will' nature of its management agreements with the related party, Horizon Group Companies, the management agreements had no going concern value." *Id.* at ¶ 37. However, this statement is overly broad and fails to distinguish the relevant circumstance at the time of the sale from those in the pre-petition period. *Id.*; *see also* Kibler Dep. at 61:6-34; 62:1-19.

13. Mr. Pakter also states that the Debtor ". . . was to receive as compensation any and all costs, expenses, and fees incurred by the Debtor in connection with the management of the

-14-

Properties." Kibler Rebuttal Report, at ¶ 38. He further states that, "The terms of the management agreements and the Debtor's tax returns indicate it was intended for the Debtor to be a 'zero profit' entity." *Id.*

14. The Debtor's Management Agreements did not provide for it to make a profit but were (in substance) cost reimbursement with no 'cost-plus.' *Id.* The Debtor had no possibility of earning a profit. *Id.* From an accounting, financial analysis, and/or business economics point of view, this indicates a non-arms-length contract. *Id.*

15. While Mr. Pakter's characterization of the Management Agreement's terms is neither complete nor comprehensive, he is correct that it was a related party agreement structured to facilitate the relationship between the Debtor and the Horizon Property Owners. *Id.* at ¶ 39. As such, the Management Agreement is not indicative of the value of the property management services being provided by the Debtor or the terms that would be required by a third party providing those services. *Id.*

16. Fair market value inherently presumes a sale to a third party on arms-length terms. *Id.* at ¶ 40. A transaction to sell the Debtor as a going concern would have required that the Debtor renegotiate its Management Agreement with the Horizon Property Owners to include, *inter alia*, market terms as to compensation for its services. *Id.*; *see also* Kibler Dep. at 44:8-13. As such, Ms. Kibler estimated the financial impact of such a renegotiation for purposes of her valuation of the Debtor. *See* Kibler Rebuttal Report, at ¶ 40.

17. Ms. Kibler prepared pro forma financial statements for the Debtor, which are attached to the Kibler Rebuttal Report as Exhibit C. *Id.* at ¶ 41.

18. Ms. Kibler made the following adjustment regarding management fees: In the Davis Report [authored by another purported expert identified by the Trustee], Mr. Davis opines

Case 16-00394   Doc 338   Filed 11/06/22   Entered 11/06/22 16:41:03   Desc Main
Document      Page 16 of 17

that, "A typical management fee payable under an arm's length [management agreement] would be in the range [of] 5-6% of effective gross income." *Id.* at ¶ 41(a). For purposes of Ms. Kibler's analysis, she accepted and applied this range. *Id.* A 5.5% management fee would have generated revenue of $1.1 million in 2011, increasing to $1.5 million in 2014, based on the income generated by the Horizon Property Owners. *Id.*

19. Ms. Kibler also made the following adjudgment regarding direct owner payroll: As noted previously, beginning in 2013, property-level employee payroll was no longer reflected as an expense of the Debtor. *Id.* at ¶ 41(b). Mr. Kibler adjusted the Debtor's payroll expense in 2011 and 2012 to remove the property-level employee payroll using the average percentage (15.8%) that the Debtor's payroll constituted of total payroll for the Debtor and the Horizon Property Owners in 2013 and 2014. *Id.*

20. Ms. Kibler also made the following adjustment regarding executive compensation: Pursuant to her executive compensation analysis, Ms. Kibler normalized the Debtor's annual executive compensation to a range of $400,000 to $475,000. *Id.* at ¶ 41(c); *see also* Kibler Dep. 69:20-24; 70:1-7.

21. Ms. Kibler considered the use of various valuation approaches and applied the market approach using the merger and acquisition method. *Id.* at ¶ 42. The market approach estimates value by comparing the subject business interest to comparative business interests that have been sold in an established marketplace. *Id.* The merger and acquisition method indicates the fair market value based on valuation multiplies implied by exchange prices for similar companies involved in actual transactions. *Id.*

22. Ms. Kibler used the Business Valuation Resource's *DealStats* (formerly *Pratt's Stats*) to identify relevant transactions, derived a multiple of 0.45 to 0.50 times revenue and sued

the midpoint of 0.475. *Id.* at ¶ 43; *see also* Kibler Dep. 80:11-19.

23. Applying this multiple to the Debtor's pro forma revenues results in a midpoint enterprise valuation increasing from $521,000 on December 31, 2011 to $716,000 on August 26, 2014. *See* Kibler Report, at ¶ 44. The Debtor's valuation would have been greater by approximately $47,000 to $65,000 using a 6% management fee, the high end of the range that the Trustee's other purported expert, Mr. Davis, characterizes as typical. *Id.*

Dated: October 17, 2022                                    Respectfully Submitted,

 

By:  *s/ Daniel A. Zazove*
     PERKINS COIE LLP

     Daniel A. Zazove
     David J. Gold
     Hailey A. Rutledge
     110 N. Wacker Dr., 34th Floor
     Chicago, IL 60606

     *Counsel for Michael Defendants*