UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 14bk41230 |
| Horizon Group Management, LLC, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Andrew J. Maxwell, trustee for the estate of | ) | |
| Horizon Group Management, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. No. 16ap00394 |
| v. | ) | |
| | ) | Judge Timothy A. Barnes |
| | ) | |
| Daniel Michael, *et al.*[*] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

This matter comes on for consideration on: (a) The Michael Defendants' Motion for Partial Summary Judgment [Adv. Dkt. No. 305] [1] (the "Defendants' Motion") brought by the Defendants in this matter collectively; and (b) Trustee's Motion for Partial Summary Judgment [Adv. Dkt. No. 308] [2] (the "Trustee's Motion" and collectively with the Defendants' Motion, the "Motions") brought

---

[*]    The defendants in this matter are Daniel Michael, Daniel Michael Living Trust u/t/a/d March 4, 1998, Martha Michael, Jeffrey Michael, Horizon Group I, LLC, Horizon Group II, LLC, Horizon Group III, LLC, Horizon Group IV, LLC, Horizon Group V, LLC, Horizon Group VI, LLC, Horizon Group VII, LLC, Horizon Group VIII, LLC, Horizon Group IX, LLC, Horizon Group X, LLC, Horizon Group XI, LLC, Horizon Group XV, LLC, Horizon Group XVI, LLC, Horizon Group XVII, LLC, Horizon Group XVIII, LLC, Horizon Group XIX, LLC, Horizon Group XX, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC, Horizon Group XXIV, LLC, and Horizon Group Realty Holdings, LLC (together, the "Defendants").

[1]    References to docket entries in the above-captioned adversary proceeding (this "Adversary Proceeding") will be denoted as "Adv. Dkt. No. ___." References to docket entries in the underlying bankruptcy case, *In re Horizon Group Management, LLC*, Case No. 14bk41230 (Bankr. N.D. Ill. filed November 14, 2014) (Barnes, J.) (the "Main Case") will be denoted as "Dkt. No. ___."

[2]    The Trustee's Motion appears to have been filed, on the same date as the filing of the Trustee's Motion, in identical form in the Main Case. Trustee's Motion for Partial Summary Judgment [Dkt. No. 464]

by Andrew J. Maxwell (the "Trustee"), trustee for the estate of Horizon Group Management, LLC (the "Debtor").

The complaint in this matter, Third Amended Complaint [Adv. Dkt. No. 78] (the "Complaint"), is 140 pages long, consisting of twenty-one enumerated counts, captioned as follows:

| | |
|---|---|
| Count I: | Breach of Management Agreements – Horizon Group Companies (defined *infra*) |
| Count II: | Equitable Contribution – Horizon Group Companies |
| Count III: | Breach of Operating Agreement – Daniel Trust (defined *infra*) |
| Count IV: | Breach of Operating Agreement – Daniel (defined *infra*) & Daniel Trust |
| Count V: | Violation of Illinois Limited Liability Company Act – Unauthorized Distributions – Daniel & Daniel Trust |
| Count VI: | Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(A) – Daniel & Martha (defined *infra*) |
| Count VII: | Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(B) – Daniel & Martha |
| Count VIII: | Fraudulent Transfer – 740 ILCS § 160/5(a)(1) – Daniel & Martha |
| Count IX: | Fraudulent Transfer – 740 ILCS § 160/5(a)(2) – Daniel & Martha |
| Count X: | Fraudulent Transfer – 740 ILCS § 160/6(a) – Daniel & Martha |
| Count XI: | Postpetition Transfer – 11 U.S.C. § 549(a) – Daniel & Martha |
| Count XII: | Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(A) – Jeffrey (defined *infra*) |
| Count XIII: | Fraudulent Transfer – 11 U.S.C. § 548(a)(1)(B) – Jeffrey |
| Count XIV: | Fraudulent Transfer – 740 ILCS § 160/5(a)(1) – Jeffrey |
| Count XV: | Fraudulent Transfer – 740 ILCS § 160/5(a)(2) – Jeffrey |
| Count XVI: | Fraudulent Transfer – 740 ILCS § 160/6(a) – Jeffrey |
| Count XVII: | Breach of Fiduciary Duty – Jeffrey |

---

(the "Main Case Motion"). This is likely because the Adversary Proceeding has been heard in combination with the Trustee's Omnibus Objection to Horizon Group Realty Holdings, LLC's Claims Number 7 and 8 [Dkt. No. 246], but has not been explained to the court. Because the two motions are identical as best as the court can determine, this Memorandum Opinion insofar as it address the Trustee's Motion will as address the Main Case Motion.

Count XVIII:  Breach of Fiduciary Duty – Daniel

Count XIX:    Disallowance, Subordination of Holdings' Claims and Declaratory Relief –11
              U.S.C. §§ 502(b)(1) & 510(c) – Horizon Group Realty Holdings, LLC
              ("Holdings")

Count XX:     Equitable Relief Piercing the Veil of the Debtor and Determination that the
              Horizon Group Companies, Holdings, Daniel, the Daniel Trust and Jeffrey
              Are Alter Egos of the Debtor

Count XXI:    Sanctions Pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy
              Procedure 9011 – Daniel & Jeffrey

Of the twenty-one counts, three have been withdrawn (Count II) or dismissed (Count IX and Count XXI).[3]

The Defendants' Motion seeks summary judgment in the Defendants' favor as to: (a) Count I as to all of the Defendants; (b) Count III; (c) Counts X and XVI for transfers that occurred prior to November 14, 2012; and (d) Counts I and XX as against Horizon Group VIII, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC and Horizon Group XXIV, LLC.

The Trustee's Motion, on the other hand, does not seek summary judgment specific to the Counts, but rather seeks a finding that, as a matter of the Order Authorizing (I) Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims and Interests and (II) the Assumption and Assignment of Executory Contracts and Unexpired Leases, and Granting Related Relief [Dkt. No. 64] (the "Sale Order") in the Main Case and thus the law of the case governing this matter, the Debtor's Management Agreement (defined *infra*) had little or no value to third-party purchasers during the four years preceding the Debtor filing for bankruptcy.

For the reasons more fully set forth below, upon review of the parties' respective filings and after conducting a hearing on the matter, the court finds that the Trustee's Motion, seeking summary judgment in his favor on that one legal issue—whether a finding of no value in a bankruptcy sale order as to an asset was preclusive on the value of the asset prepetition for the purposes of establishing the elements of a fraudulent transfer—is not well taken and must and will be, by separate order entered concurrent herewith, DENIED.

The Defendants fare better, having shown that the Trustee has no golden creditor on which to predicate state law avoidance earlier than captured by bankruptcy avoidance. In all other respects, the Defendants' Motion fails. The Defendants' Motion will, therefore, by separate order entered concurrent herewith, be GRANTED in part and DENIED in part.

---

[3]      Count IX was dismissed with prejudice by the court pursuant to the Order Granting in Part and Denying in Part Defendants' Motion to Dismiss with Leave to Amend Complaint [Adv. Dkt. No. 56] (the "MTD Order"). The MTD Order also dismissed Count XXI with prejudice with respect to the method of seeking sanctions (by adversary complaint), but not with respect to the ability to bring the same request by motion if the facts and law warrant it.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy court judge to whom a case has been referred has statutory authority to enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy court judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court judge may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1) & (c). Absent consent, the bankruptcy court judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy court judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 462 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court judge hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court judge's jurisdiction); *Richer v. Morehead,* 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The Trustee asserts that Counts VI–XVI, XIX and XX of the Complaint are core proceedings under section 157 of the title 28 of the United States Code. 28 U.S.C. § 157(b)(2)(A), (C), (F), (H) and (O); Compl., at ¶ 11. The Trustee further asserts that Counts I, III–V, XVII and XVIII are noncore. 28 U.S.C. § 157(b); Compl., at ¶ 12. The Trustee has consented to final judgment on all counts of the Complaint. Compl., at ¶ 13.

The Defendants, on the other hand, have challenged whether all of the Counts of the Complaint are core. Defendants' Answer and Affirmative Defenses to Third Amended Complaint [Adv. Dkt. No. 95] (the "Answer"). Specifically, the Defendants assert that only Counts VI, XI–XIII and XIX of the Complaint are core, and that all other counts are noncore. Answer, at p. 8. Despite this position, the Defendants did not expressly comply with Rule 7012(b) of the Federal

Rules of Bankruptcy Procedure[4] by including "a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court." Fed. R. Bankr. P. 7012(b).

As to the matters on which the parties agree are core and have not challenged the court's ability to enter final judgment thereon, the court determines that it may enter final judgment on the matters. *See, e.g., Wellness*, 575 U.S. at 669. *Richer*, 798 F.3d at 490.

As to the matters on which the parties agree are noncore, Counts I, III–V, XVII and XVIII, and on which parties disagree, Counts VII–X, XIV–XVI and XX, as neither party has challenged the ability of the court to enter final judgment, as the Defendants have failed to comply with Bankruptcy Rule 7012(b) and as the Defendants have specifically asked for summary judgment on Counts I, III, X, XVI and XX without any indication that the request was not for final judgment but rather a finding and conclusion, the court concludes that the Defendants have impliedly consented to this court entering final judgment in this matter. *Richer*, 798 F.3d at 490; *Res. Funding, Inc. v. Pac. Cont'l Bank (In re Washington Coast I, L.L.C.)*, 485 B.R. 393, 409 (B.A.P. 9th Cir. 2012) ("Failure to implicate and follow such consent procedures for non-core matters also constitutes consent to the authority of the bankruptcy court to enter orders and judgments.").

Accordingly, the court has the jurisdiction, statutory authority and constitutional authority to hear and determine both the Trustee's Motion and the Defendants' Motion.

PROCEDURAL HISTORY

In taking up the Motions, the court has considered the Complaint, the Answer and the Motions themselves, the arguments of the parties at the November 9, 2022, and February 8, 2023, hearings on the Motions and has reviewed and considered the following filed documents relating to the Motions:

(1)    Statement of Undisputed Facts. Trustee's Motion [Adv. Dkt. No. 308-1] (the "Trustee's SUF");

(2)    The Michael Defendants' Statement of Material Facts as to Which There Is No Genuine Issue. Defendants' Motion [Adv. Dkt. No. 305-1](the "Defendants' SUF");

(3)    Memorandum in Support of the Michael Defendants' Motion for Partial Summary Judgment [Adv. Dkt. No. 319];

(4)    The Michael Defendants' Response and Objection to the Trustee's Motion for Partial Summary Judgment [Adv. Dkt. No. 321];

(5)    Trustee's Response in Opposition to Defendants' Motion for Partial Summary Judgment [Adv. Dkt. No. 322] (the "Trustee's Response");

---

[4]    The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") will be referred to herein individually as "Bankruptcy Rule ___." The Federal Rules of Civil Procedure (the "Civil Rules") will be referred to herein individually as "Civil Rule ___."

(6)     Trustee's Statement of Additional Undisputed Facts [Adv. Dkt. No. 324] (the "Trustee's SAUF");

(7)     Table of Exhibits of Trustee's Statement of Additional Undisputed Facts and Trustee's Response to Defendants' Statement of Undisputed Facts [Adv. Dkt. Nos. 325–26; 329–30];

(8)     Trustee's Response to Michael Defendants' Statement of Additional Facts [Adv. Dkt. No. 332];

(9)     Trustee's Reply in Support of Motion for Partial Summary Judgment [Adv. Dkt. No. 333];

(10)    Michael Defendants' Response to Trustee's Statement of Additional Undisputed Facts [Adv. Dkt. No. 335];

(11)    The Michael Defendants' Reply in Support of Their Motion for Partial Summary Judgment [Adv. Dkt. No. 336]; and

(12)    The Michael Defendants' Response to Plaintiff's Statement of Undisputed Facts and the Michael Defendants' Statement of Additional Facts [Adv. Dkt. No. 338].

The court has also taken into consideration any and all exhibits submitted in conjunction with the foregoing.  Though these items do not constitute an exhaustive list of the filings in the Adversary Proceeding or Main Case, the court has taken judicial notice of the contents of the dockets in this matter.  *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).  The court has also considered the procedural history and previous court filings in this Adversary Proceeding and the Main Case, as is discussed below in detail.

## BACKGROUND

The dispute underlying this Adversary Proceeding is both simple and complex.  The simplicity of the matter relates to the Debtor's path to bankruptcy.

Prior to the commencement of the Main Case, the Debtor was engaged in the residential real property management business as sole property manager for the "Horizon Group Companies" and last maintained an office at 1946 West Lawrence Avenue, Chicago, Illinois.  Defendants' SUF, at ¶ 2.  The number of residential units managed by the Debtor was in the thousands.  Trustee's SAUF, at ¶ 2.

The Horizon Group Companies is one of the appellations use by the Trustee for the series of family trusts and ownership entities that own and manage rental property (the "Properties"), mostly in the City of Chicago.[5]  More specifically, in paragraph 42 of the Complaint, the Trustee

---

[5]     Horizon Group VIII, LLC, and Horizon Group XXIII, LLC, do not own property within the City of Chicago.  Defendants' SUF, at ¶¶ 7–8.

incorporates the companies listed in paragraphs 21 though 41 as the "Horizon Group Companies." By that reference and as used in this decision, the Horizon Group Companies consists of Horizon Group I, LLC (Compl., at ¶ 21), Horizon Group II, LLC (Compl., at ¶ 22), Horizon Group III, LLC (Compl., at ¶ 23), Horizon Group IV, LLC (Compl., at ¶ 24), Horizon Group V, LLC (Compl., at ¶ 25), Horizon Group VI, LLC (Compl., at ¶ 26), Horizon Group VII, LLC (Compl., at ¶ 27), Horizon Group VIII, LLC (Compl., at ¶ 28), Horizon Group IX, LLC (Compl., at ¶ 29), Horizon Group X, LLC (Compl., at ¶ 30), Horizon Group XI, LLC (Compl., at ¶ 31), Horizon Group XV, LLC (Compl., at ¶ 32), Horizon Group XVI, LLC (Compl., at ¶ 33), Horizon Group XVII, LLC (Compl., at ¶ 34), Horizon Group XVIII, LLC (Compl., at ¶ 35), Horizon Group XIX, LLC (Compl., at ¶ 36), Horizon Group XX, LLC (Compl., at ¶ 37), Horizon Group XXI, LLC (Compl., at ¶ 38), Horizon Group XXII, LLC (Compl., at ¶ 39), Horizon Group XXIII, LLC (Compl., at ¶ 40), and Horizon Group XXIV, LLC (Compl., at ¶ 41).

Each of the Properties is, in turn, ultimately owned by Daniel Michael ("Daniel") and his family either directly or through a series of family trusts. Trustee's SUF, at ¶¶ 34–38. The collective group is referred to by the Trustee as the "Horizon Realty Group" or the "Horizon Group Enterprise" at different times. Compl., at ¶ 1. The Trustee also asserts that the Horizon Realty Group is not a legally assumed name of the Debtor, but was used by all members of the Horizon Group Enterprise. *Id.*

In this relationship, Daniel was the sole manager of the Debtor while one of his family trusts, Daniel Michael Living Trust u/t/a/d March 4, 1998 (the "Daniel Trust"), was the sole member of the Debtor. Trustee's SUF, at ¶¶ 6, 7. Daniel's son, Jeffrey Michael ("Jeffrey"), served as the chief operating office and general counsel to the Debtor, though Jeffrey was not authorized to practice law during all of the events in question. *Id.* at ¶¶ 11–12.

As part of the relationship, Daniel, as manager of the Debtor, and Daniel as trustee of the Daniel Trust, as "General Member" of the Debtor, executed an operating agreement for the Debtor (the "Operating Agreement"). *Id.* at ¶ 37. Daniel himself became a limited member of the Debtor under the Operating Agreement. *Id.* at ¶ 40. Further, in 2008, the Debtor and the then existing members of the Horizon Group Companies entered into an Amended & Restated Management Agreement (as subsequently amended and as attached to the Defendant's Motion as Exhibit C, the "Management Agreement"), *Id.* at ¶¶ 43, 49, appointing the Debtor as the "sole and exclusive manager" of the Properties and as agent of the respective owners of the Properties. *Id.* at ¶¶ 9, 43.

On June 24, 2009, one of the tenants of the Properties managed by the Debtor, Amanda Bonnen ("Bonnen"), commenced in state court a putative class action against the Debtor in the Circuit Court of Cook County, Illinois (the "State Court"), case number 2009 CH 20365 (the "Class Action"). Defendants' SUF, at ¶ 11. In the Class Action, Bonnen alleged violations of Chicago Residential Landlord Tenant Ordinance ("RLTO"), *id.*, in that the Debtor had failed to pay the correct amount of interest on security deposits to certain tenants. Trustee's SAUF, at ¶ 8. The State Court ultimately certified a class (the "Class"). Defendants' SUF, at ¶ 14.

Subsequently, the parties to the Class Action entered into a settlement agreement that was approved by the State Court. Defendants' SUF, at ¶¶ 15, 19; Defendants' Motion, Exh. D (the "Settlement Agreement"). The Settlement Agreement was dated November 21, 2013, Trustee's SAUF, at ¶ 18, preliminarily approved by the State Court on December 2, 2013, and finally approved by the State Court on March 13, 2014. *Id.*, at ¶¶ 20, 22. It resulted in the creation of a

Class Action claims administrator, to which the Debtor wired $40,000.00 to fund the settlement. *Id.*, at ¶ 16. On August 27, 2014, the State Court entered an order awarding fees to counsel for the Class (the "Class Counsel") in the amount of $818,472.72 in fees and $14,982.60 in costs, for a total award of $833,455.32 (the "Class Counsel Award"). Defendants' SUF, at ¶ 25.

On November 14, 2014 (the "Petition Date"), without having paid the Class Counsel Award, the Debtor filed a petition for bankruptcy under chapter 11 of the Bankruptcy Code. Compl., at ¶ 256. The Debtor alleged in its bankruptcy filings that the unexpected size of the Class Counsel Award was the precipitating event for the bankruptcy filing. Compl., at ¶ 262.

On February 27, 2015, the Debtor sought approval from the court to sell substantially all its assets. Debtor's Motion to Authorize (1) Sale of Substantially All of Its Assets Free and Clear of Liens, Claims and Interests, (2) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (3) Related Relief [Dkt. No. 49] (the "Sale Motion"); Trustee's SUF, at ¶ 52. That approval was granted on April 2, 2015. Sale Order; Trustee's SUF, at ¶ 53.

On May 12, 2015, the Debtor's chapter 11 case was converted to one under chapter 7 of the Bankruptcy Code and the Trustee was appointed. Order Converting Debtor's Case to Chapter 7 [Dkt. No. 82]. After a period of investigation, the Trustee commenced this Adversary Proceeding on July 1, 2016. [Original] Complaint [Adv. Dkt. No. 1].

In the Complaint, the Trustee alleges a number of causes of action focused on the ownership and management of the Debtor, as well as transfers by the Debtor before and after the commencement of the Main Case. The Trustee alleges that Daniel, as the party with the chief financial interest underlying the Debtor's operations, and Jeffrey, as the party chiefly responsible for the management and operations of the Debtor, are liable for many of the acts and/or omissions by the Debtor. As a result, the Trustee alleges that Jeffrey, Daniel and the Daniel Trust (as the managing member of the Debtor) are liable to the Debtor's estate for the claims that have arisen. Further, the Trustee argues that both Daniel and Martha Michael ("Martha"), Daniel's wife, are liable for the receipt of a number of pre and postpetition transfers from the Debtor. The Complaint's allegations against the other Defendants are that they are alter egos of either Daniel or the Debtor and thus may also be liable to the Debtor's estate for the claims against it.

The Defendants, of course, refute the Trustee's allegations and assert a variety of affirmative defenses with respect to the same. Answer, *infra*.

SUMMARY OF ISSUES PRESENTED

Into this context come the Defendant's Motion and the Trustee's Motion.

The Defendants' Motion seeks summary judgment in the Defendants' favor as to:
(a) Count I as to all of the Defendants; (b) Count III; (c) Counts X and XVI for transfers that occurred prior to November 14, 2012; and (d) Counts I and XX as against Horizon Group VIII, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC and Horizon Group XXIV, LLC.

The Trustee's Motion, on the other hand, does not seek summary judgment specific to the Counts, but rather seeks a finding that, as a matter of the Sale Order in the Main Case and thus the

8

law of the case governing this matter, the Debtor's Management Agreement had little or no value to third-party purchasers during the four years preceding the Debtor filing for bankruptcy.

DISCUSSION

Both the Defendant's Motion and the Trustee's Motion seek summary judgment under Civil Rule 56. As a result, the court first takes up the standard for and rules governing such requests. After doing so, the court will then take up the Defendant's Motion and the Trustee's Motion, in turn.

A.      Summary Judgment under Fed. R. Civ. P. 56

Summary judgment is an all-to-often used procedural device that allows parties to seek an early, dispositive ruling from the court on the matters before it. Far too frequently parties move for summary judgment as the presumed next step in litigation, without first giving proper heed to the high standards applicable to summary judgment and the substantial waste that ensues when parties seek summary judgment despite being clearly ineligible for it.

Make no mistake, the standards for summary judgment are high. Fed. R. Civ. P. 56(e) (made applicable to the Adversary Proceeding by Bankruptcy Rule 7056). As the Seventh Circuit has made clear, summary judgment is only appropriate if the movant can establish its two predicates. *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). First, the movant must establish that on the pleadings, moving papers and affidavits or other evidence submitted therewith there is no genuine issue of material fact. *Id.* Second, the movant must establish that it is entitled to judgment as a matter of law. *Id.* As noted, the burden of proof on summary judgment rests squarely on the movant. *EEOC v. Watkins Motor Lines, Inc.*, 553 F.3d 593, 596 (7th Cir. 2009); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921–22 (7th Cir. 2007).

The import of the foregoing should not be lost. Summary judgment is only appropriate if both the unassailable, material facts and the law favor the movant. That standard is rarely met. For example, all too often a party moves for summary judgment on an issue that factually turns on a party's intent. As this court has frequently stated, when intent is at issue, it is almost never established without testimony at trial. *McGee v. Reed* (*In re Reed*), Case No. 18BK19801, 2021 WL 4028730, at *7 (Bankr. N.D. Ill. Sept. 3, 2021) (Barnes, J.); *see also P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986).

On the other hand, factual dispute over immaterial facts will not prevent summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphases in original); *Newman v. Assoc. Bank, Nat'l Ass'n* (*In re World Mktg. Chi., LLC*), 574 B.R. 670, 677 (Bankr. N.D. Ill. 2017) (Barnes, J.). To be genuinely at issue, the disputed fact must be outcome determinative under governing law. *Sylvester v. Martin* (*In re Martin*), 130 B.R. 930, 937 (Bankr. N.D. Ill. 1991) (Schmetterer, J.) (*citing Anderson*, 477 U.S. at 248). Put another way, a genuine issue of material fact exists if, after a resolution of the disputed fact by the factfinder (but not before), "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 258; *Dunn*, 880 F.3d at 905. The court makes this determination under the

9

standard that would be used at trial. *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987) (*citing Anderson*, 477 U.S. at 252).

The purpose of summary judgment is to enable the early disposition of purely legal issues (or the early legal disposition of an entire matter) where there is no evidentiary dispute necessitating a trial. *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, Case No. 13cv01686, 2015 WL 9304343, at *4 (N.D. Ill. Dec. 22, 2015); *World Mktg.*, 574 B.R. at 677.

As summary judgment motions "are usually . . . decided on documentary evidence," *Anderson,* 477 U.S. at 251 (internal quotations omitted), the movant must demonstrate that no genuine dispute of material fact exists by citing to materials in the record. Fed. R. Civ. P. 56(c)(1); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

At this stage, "it is not the court's function to resolve factual disputes or to weigh conflicting evidence." *Chi. Reg'l Council of Carpenters Pension Fund v. Jerald Van Der Laan* (*In re Van Der Laan*) 556 B.R. 366, 372 (Bankr. N.D. Ill. 2016) (Schmetterer, J.) (citations omitted); *see also Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) ("[T]he appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment motion."). It is outside the judge's province to assess the credibility of evidence on a summary judgment motion. *Anderson*, 477 U.S. at 255. Nonetheless, the court, if needed, must make preliminary, nonbinding determinations of what is or is not admissible evidence. *See id.* at 248. It is necessary for the court to consider at this stage what material facts are undisputed, whether by express agreement or by failure to carry a party's burden with respect thereto. *See, e.g., Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

The court in considering summary judgment motions construes the evidence and all reasonable inferences in favor of the non-moving party. *Durable Mfg. Co. v. U.S. Dep't of Labor,* 578 F.3d 497, 501 (7th Cir. 2009). When a material fact or set of facts gives rise to competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. *Coles v. City of Chicago,* 361 F. Supp. 2d 740, 741–42 (N.D. Ill. 2005).

On a motion for summary judgment on a particular claim or defense, the court may grant summary judgment with respect to certain elements of such claim or defense, even if the court does not grant all of the relief requested. Fed. R. Civ. P. 56(a), (g); *U.S. Bank Nat'l Ass'n v. Builders Bank*, Case No. 08-C-5648, 2011 WL 1103875, at *6 (N.D. Ill. Mar. 25, 2011); *Cord v. Jaspan Schlesinger Hoffman, LLP* (*In re Monahan Ford Corp. of Flushing*), 390 B.R. 493, 501 (Bankr. E.D.N.Y. 2008) ("Although ultimate judgment cannot be awarded unless all elements are established, nothing prevents the court, under [Civil] Rule 56(a), from awarding summary judgment on the first two elements of the claim, where, as here, none of the material facts necessary to establish those elements are in dispute.").

B.    The Defendant's Motion

The Defendants' Motion seeks summary judgment in the Defendants' favor as to: (a) Count I as to all of the Defendants; (b) Count III; (c) Counts X and XVI for transfers that occurred prior to November 14, 2012; and (d) Counts I and XX as against Horizon Group VIII, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC and Horizon Group XXIV, LLC. The court will take up each request, in turn.

10

1.    *Count I*

In Count I of the Complaint, the Trustee seeks to recover from the Horizon Group Companies the costs, expenses and fees incurred by the Debtor in connection with its operation of the Properties and its business pursuant to the Management Agreement.  The Trustee alleges that the Horizon Group Companies breached the Management Agreement by not compensating the Debtor for the following costs, expenses and fees (the "Alleged Expenses"):

(i)    obligations under the Settlement Agreement [Claim Nos. 11 and 12];

(ii)    legal expenses relating to the defense of the Class Action [Claim No. 3];

(iii)    U.S. Trustee quarterly fees and other legal expenses relating to the chapter 11 phase of this bankruptcy case [Dkt. No. 133] and [Claim No. 2];

(iv)    legal expenses relating to the Unite Here Union negotiations [Dkt. No. 135] and [Claim No. 6];

(v)    accounting software and other general business expenses [Claim Nos. 9 and 10]; and

(vi)    taxes and penalties [Claim No. 14].

At its essence, Count I is therefore a breach of contract claim.  Under Illinois law,[6] "[t]he elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff."  *Henderson-Smith & Assocs., Inc. v. Nahamani Fam. Serv. Ctr. Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001) (*citing Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999)); *Smith v. Jones*, 497 N.E.2d 738, 740 (Ill. 1986).  It is undisputed that a valid and enforceable contract existed, there was performance by the plaintiff and an injury to the Debtor's estate.  The only element in dispute is whether there was a breach of contract by the Horizon Group Companies.

The Management Agreement contains the following provision in relation to costs, expenses and fees:

As compensation for the services provided by HGM[7] under this Agreement, Owner[8] shall pay HGM a fee in an amount equal to such Owner's share of any and all costs, expenses (direct and indirect) and fees incurred by HGM on behalf of an Owner in connection with and allocable to the operation and management of the Properties owned by the Owner and the operation of HGM that is not otherwise reimbursed to HGM as provided in this Agreement (the "Component A Fee").  The Component A Fee shall include, without limitation, (i) all costs, expenses, and fees, for materials, labor and services rendered, (ii) administrative expenses, labor and overhead costs

---

[6]    The Management Agreement contains a choice-of-law provision that states it will be construed pursuant to Illinois law.  Management Agreement, at § 16.9.

[7]    Defined in the Management Agreement as the Debtor.  Management Agreement, at p. 1.

[8]    Defined in the Management Agreement as the list attached as Exhibit A to the Management Agreement which lists the Horizon Group Companies numbered I-IV, VI-XI and XV–XX.  Management Agreement, at p. 1.

incurred by HGM on behalf of an Owner, and (iii) those expenses incurred by HGM in relation to its own operations and the operations of each of the Properties owned by the Owners.

Management Agreement, at ¶ XI (the "Costs Provision"). To succeed, the Trustee must demonstrate the Alleged Expenses are what is contemplated to be reimbursed to the Debtor under the Costs Provision.

In the Defendants' Motion, the Defendants seek dismissal of Count I as to all Defendants by arguing that the Management Agreement does not require the Horizon Group Companies to pay costs associated with the litigation and the Settlement Agreement regarding the RLTO because those costs are not operating expenses incurred by the Debtor on behalf of the Horizon Group Companies. They further assert that, even if those are the type of costs and expenses contemplated in the Costs Provision, an indemnity clause in the Management Agreement prohibits reimbursement when the expenses are the result of the Debtor's negligence. The court will take up the former issue first.

(a)     The Scope of the Costs Provision

The Defendants argue that the express language of the Costs Provisions only governs costs, expenses and fees connected to the operation and management of the Properties. The Trustee counters that claims related to the RLTO are relatively certain to be asserted against landlords and despite this, the Management Agreement does not contain any exclusion to RLTO related expenses.

The parties therefore differ on the scope of Costs Provision.

Under Illinois law, "[t]he construction of a contract presents a question of law." *Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007). "The primary objective in construing a contract is to give effect to the intent of the parties." *Id.* at 58. "[T]he language [of the contract], given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* "[I]f a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract." *Hanover Ins. Co. v. Northern Building. Co.*, 751 F.3d 788, 792 (7th Cir. 2014) (*quoting C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999)).

The court finds no ambiguity in the Costs Provision in and of itself. It expressly requires the reimbursement of "any and all costs, expenses (direct and indirect) and fees incurred by HGM on behalf of an Owner in connection with and allocable to the operation and management of the Properties[9] owned by the Owner and the operation of HGM."

The Costs Provision is not unclear and the Defendants' argument that RLTO liability is somehow outside the scope of this broad provision is unfounded. The plain language of the Costs Provision would include those costs and expenses arising from RLTO related litigation, as such are costs relating to the operation and management of the Properties owned by the Horizon Group Companies. Those were the cost of doing business, whether paid up front on compliance with the

---

[9]     Defined as "all of the land, buildings, fixtures, and other improvements contained on the properties listed on Exhibit A from time to time ("Properties") as owned by Owner." Management Agreement, at § 1.2.

RLTO obligations or paid later for noncompliance.  There is nothing in the plain language of the contract that would lead the court to conclude that the parties' intended otherwise.

Count I is a pure contract claim under the Costs Provision.  As per that contract claim, however, it is not immediately clear to the court whether the elements of the Costs Provision have been properly shown in light with that contract claim (*e.g.*, what is the Component A Fee and what is each applicable Defendant's share of the Component A Fee) and whether the Alleged Expenses stray beyond what is properly included in the Component A Fee.  For example, attorneys' fees may or may not be viewed as normal expenses of doing business.  There may be a course of dealing or other factors that should be taken into account.  That has not been shown.  As a result, while it does appear that the Defendants' attempt to dismiss Count I is misplaced, material facts remain that warrant permitting Count I to proceed.

That having been said, the Illinois Supreme Court has warned against interpreting the intent of the parties from "detached portions of a contract or from any clause or provision standing by itself." *Gallagher*, 226 Ill. 2d at 233.  With that in mind, the court turns to the Defendants' arguments pertaining to indemnification.

(b)      Indemnification

The Defendants argue that, irrespective of what is contained in the Costs Provision, the Trustee has pled himself out of Count I by alleging that Jeffrey failed to exercise reasonable care in overseeing the Debtor and the Horizon Group Companies' compliance with the RLTO as indemnification for such acts is expressly excluded in the Management Agreement.

In this regard, the Management Agreement contains the following provision in relation to indemnification:

> Nothing contained in this Article shall require Owner to indemnify HGM or defend or hold HGM harmless from any claims or actions resulting from acts or omissions which constitute negligence or willful misconduct on the part of HGM or any of HGM's employees or agents, or any acts or omissions which are outside the scope of HGM's authority or responsibility hereunder or which are in beach of HGM's duties hereunder.

Management Agreement, at ¶ 15.2 (the "Indemnification Provision").

Putting aside that negligence and lack of reasonable care do not necessarily equate, in response, the Trustee asserts that he is not seeking indemnification against the underlying claims in the Class Action, but is seeking compensation and reimbursement of the costs, expenses, and fees the Debtor incurred in procuring a release of the Defendants' liability through the Settlement Agreement.  Further, the Trustee argues the RLTO imposes strict liability and the Settlement Agreement did not admit fault.

As to the latter, while it is true that the State Court made no finding of negligence or a lack thereof, the absence of such a finding is not outcome determinative here.

As to the former, however, the Trustee is correct that the Complaint asserts no count for indemnification.  "Indemnification agreements are to be construed like any other contract under

Illinois law." *CSX Transp., Inc. v. Chicago & N. W. Transp. Co.*, 62 F.3d 185, 189 (7th Cir. 1995). It is true that Illinois courts "endeavor to construe contracts as a whole, giving meaning to each provision." *Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000). The Defendants' argument here doesn't seek simply to give the Indemnification Provision meaning, however. It seeks to afford it a meaning that is contrary to the plain language of such contractual provisions.

A contractual indemnity claim is a legal right that arises from a contract where one party (the indemnitor) agrees to indemnify and hold harmless another party (the indemnitee) from specified losses, damages, or liabilities. It is a provision in a contract that allocates the risk and responsibility for certain potential losses or liabilities between the contracting parties. *Singer v. Bulk Petroleum Corp.*, 9 F. Supp. 2d 916, 923 (N.D. Ill. 1998) (*citing McMinn v. Cavanaugh*, 532 N.E.2d 343, 357 (Ill. App. Ct. 1988)). Breach of contract claims, such as the Trustee's claim that the Costs Provision have been breached, are distinct from indemnification claims. *See, e.g., Steiner Diamond & Co. v. Flashner Med. P'ship*, 599 N.E.2d 1323, 1325 (Ill. App. Ct. 1992), *opinion modified on denial of reh'g* (Nov. 13, 1992). While Illinois courts view contracts as a whole, giving meaning to each provision, and eschew giving detached portions of a contract meaning out of context of the contract as a whole, these two provisions are not inconsistent and the contract is not ambiguous. "The fact that parties disagree about the meaning of a contractual provision does not mean the contract is ambiguous." *Interim Health*, 225 F.3d at 879.

The Costs Provision claim under Count I is a breach of contract claim, not an indemnification claim. However, it is not immediately clear to the court whether each of the Alleged Expenses are in fact elements of the Component A Fee or rather disguised indemnification claims. That turns on the facts of each element. Thus, while the Defendants' legal theories are misplaced insofar as they seek dismissal of Count I, they may still be raised with respect to the factual elements of the Alleged Expenses when and if this matter goes to trial.

As a result, neither party is entitled to summary judgment on Count I.

2. *Count III*

In Count III of the Complaint, the Trustee seeks judgment against the Daniel Trust for the Alleged Expenses on a breach of contract theory. The Trustee alleges that the Daniel Trust breached the Operating Agreement by not: (1) deciding whether a capital call was reasonably necessary to meet expenses of the Debtor; (2) paying the funds reasonably necessary to meet expenses of the Debtor; and (3) giving written notice of the additional contribution to the Daniel Trust. To recover these expenses, the Trustee requests the court appoint a person to perform the preceding duties.

The Operating Agreement contains the following provision in relation to additional contributions by members:

> General Members shall be required to make such additional Capital Contributions as shall be determined by a Majority Interest from time to time to be reasonably necessary to meet the expenses and obligations of the Company. After the making of any such determination, the Managers shall give written notice to each General Member of the amount of required additional contribution, and each General

Member shall deliver to the Company its pro rata share thereof (in proportion to the respective Percentage Interest of the General Member on the date such notice is given) no later than thirty days following the date such notice is given. None of the terms, covenants, obligations or rights contained in this Section 9.02 is or shall be deemed to be for the benefit of any Person or Entity other than the Members and the Company, and no such third person shall under any circumstances have any right to compel any actions or payments by the Managers and/or the Members.

Management Agreement, at § 9.02 (the "Capital Contribution Provision"). The Operating Agreement defines the Debtor as the Company. *Id.*, at § 2.02. Daniel is listed as the manager of the Debtor (the "Manager"). *Id.*, at § 5.02. It lists one general member, Daniel Michael as trustee of the Daniel Trust (the "General Member"), and one limited member, Daniel Michael as the trustee of the Daniel Trust (the "Limited Member"). *Id.*, at § 4.01. The Limited Member held a 95% interest in the Debtor while the General Member held a 5% interest. Lastly, the Majority Interest is defined as "one or more General Member Interests which in the aggregate exceed 50% of all Percentage Interests attributed to the General Members." *Id.*, at § 1.01(v). While this definition could hardly be more confusing, it is undisputed that the Daniel Trust, as the only General Member, is the Majority Interest.

By its plain language, the Capital Contribution Provision requires (i) a determination by a Majority Interest that an additional capital contribution is reasonably necessary to meet the expenses and obligations of the Company; and (ii) written notice from the Managers to each General Member of the amount of required additional contribution. Only thereafter are the General Members responsible for making their pro rata share of the contribution.

As with Count I, Count III narrowly focuses on this one contractual element. For the Trustee to succeed, he will have to prove that the Daniel Trust, as the Majority Interest, breached the Capital Contribution Provision.

The Defendants assert that the Trustee fails to establish that the conditions precedent have been met in order for the Capital Contribution Provision to result in liability. First, the Defendants argue that the Daniel Trust never determined that a capital contribution was necessary. Second, that Daniel, in his capacity as manager of the Debtor, never sent a written notice to the Daniel Trust necessitating a capital contribution. Further and apart from the conditions precedent, the Defendants argue that a capital contribution was not necessary after the Debtor ceased to be a going concern as a result of the sale of its assets in the Main Case.

In opposition, the Trustee argues that Daniel, as manager of the Debtor, had a good faith obligation to determine the amount of the capital contribution that was needed and his failure to perform such obligation excuses the conditions precedent. *Grill v. Adams*, 463 N.E.2d 896, 900 (Ill. App. Ct. 1984) ("Where the obligation of one party is subject to the occurrence of a condition precedent, the duty of good faith and fair dealing is imposed upon that party."). The Trustee argues in the alternative that the court is authorized under Civil Rule 70(a), made applicable to this adversary proceeding through Bankruptcy Rule 7070, to appoint a person to perform as was required under the Capital Contribution Provision. Last, the Trustee argues that the obligation to make a capital contribution arose when the Defendants authorized the Debtor to enter into the Settlement Agreement and that Daniel, as manager of the Debtor, should have known a capital contribution would be necessary to fulfill the Debtor's obligations under the Settlement Agreement.

15

Here, the parties do not dispute the meaning of the additional Capital Contribution Provision. The dispute is over the actions taken or lack thereof (maybe) of the Daniel Trust and Daniel, as both manager of the Debtor and trustee of the Daniel Trust. Neither party has made a compelling argument that this can be resolved under the law as they have argued it.

It is true that, "[i]n Illinois, a covenant of good faith and fair dealing is implied in every contract absent express disavowal." *Interim Health*, 225 F.3d at 884. It is no surprise therefore that Illinois courts have held that such a duty of good faith and fair dealing extends to contractual conditions precedent. *Grill*, 463 N.E.2d at 900. Further, as the *Grill* court stated, "[a] party cannot take advantage of his own conduct and claim that failure of the fulfillment of a condition therefore defeats his liability." *Id.* (*citing to Yale Development Co., Inc. v. Oak Park Trust & Savings Bank*, 325 N.E.2d 418, 422 (Ill. App. Ct. 1975)).

As the Seventh Circuit has stated, "[p]roblems relating to good faith performance are most common where one party to an agreement is given wide discretion, and the other party must hope the discretion is exercised fairly." *Interim Health*, 225 F.3d at 884. "When one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Id.*

It is unclear to the court whether Daniel made any decision regarding the issue at bar, pro or con, and thus whether Daniel's actions or inactions were unreasonable, with improper motive, arbitrary, capricious or in a manner inconsistent with the reasonable expectations of the parties. These are almost entirely factual determinations. As a result, a genuine issue of material fact exists regarding how much and why Daniel acted (or did not act) as he did. Summary judgment on this issue is inappropriate.

       3.      *Counts X and XVI*

As previously mentioned, the Defendants' Motion only seeks summary judgment in their favor with respect to transfers that occurred prior to November 14, 2012. While not fully explained by either party, the importance of this time frame appears to be that it is precisely two years before the Petition Date. This means that for fraudulent transfers occurring prior to this date, the Plaintiffs cannot rely solely on federal avoidance under section 548 of the Bankruptcy Code, but must instead avail themselves of state law avoidance mechanisms by way of section 544 of the Bankruptcy Code.

Section 544 provides, in pertinent part, that:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

In the Complaint, the Trustee relies on section 544(b)(1) in conjunction with 740 ILCS § 160/6(a) to argue that Daniel and Martha (Count X) and Jeffrey (Count XVI) received fraudulent transfers from sometime in 2010 to the Petition Date. Compl., at ¶¶ 357–61, 378–82, Exh. 7. A

creditor in Illinois may avoid a transfer or obligation of a debtor if the creditor's claim arose before that transfer or obligation and "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 ILCS § 160/6(a).

As a party seeking to avoid such transfers under Illinois law in a bankruptcy need not be the affected creditor itself, but rather a party standing in that creditor's shoes, the section 544 and the bankruptcy case law impose the requirement that the plaintiff identify such a creditor to be successful. *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014) ("Section 544(b) is unique in another regard: its terms require the actual existence of an unsecured creditor that could have brought the state-law action itself. 'If there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under section 544(b)(1)'." (internal citations omitted)). This is often called the "golden creditor."

In the Complaint, the Trustee seeks to satisfy the golden creditor requirement generally, asserting that "[t]here are creditors of the Debtor's estate whose claims arose before the transfers were made." Compl., at ¶¶ 351, 356, 359, 372, 377, 380. In the Defendants' Motion to Dismiss the Amended Complaint [Adv. Dkt. No. 43] (the "First Motion to Dismiss"), the Defendants argued that this was insufficient to satisfy pleading requirements and that the Trustee had to point to a specific golden creditor.

This vague form of pleading raises concerns. The Seventh Circuit has stated that "[t]he trustee need not identify the creditor, so long as the unsecured creditor exists." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998) (*citing In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997)).[10] The problem with this phrasing is that implies that a plaintiff may proceed generally as the Trustee has here without any regard to the burdens on him. That simply cannot be the case. Instead, the case law makes clear that, even if a plaintiff need not specifically identify a creditor, she must nonetheless prove the existence of such creditor. *Sherman v. OTA Franchise Corp. (In re Essential Fin. Educ., Inc.)*, 629 B.R. 401, 420 (Bankr. N.D. Tex. 2021) ("Although the Trustee must prove the existence of this so-called "golden creditor," the Trustee need not specifically identify the "golden creditor."). Thus, a plaintiff still bears a burden of proof with respect to this element, and the court must be able to conclude that such a burden has been met. At the very least, the court must be reasonably assured that such a creditor exists, even if the plaintiff need not specifically identify the creditor.

At the time the Defendants first raised this challenge, it was quite easy for the court to be so reasonably assured as the claims docket for the Main Case reflected that the Internal Revenue Service held claims against the Debtor stemming back to 2008. Claim No. 13-1 in the Main Case. Having a specific, identifiable creditor by definition satisfies the court's need to be so reasonably assured. As a result, the court denied the Defendant's First Motion to Dismiss with respect to

---

[10]     A close reading of *Leonard* calls into question the broad phrasing of the issue in *Image Worldwide*. In *Leonard*, the Seventh Circuit appeared to be stating that a trustee need not identify a specific creditor into whose shoes she may step to satisfy every aspect of avoidance (e.g., the trustee need not find a creditor who is owed enough to justify the entire avoidance), but rather a trustee must only identify creditor(s) who could commence an action. *Leonard*, 125 F.3d at 544.

transfers prior to November 14, 2012.[11]  Order Granting in Part and Denying in Part Defendants' Motion to Dismiss with Leave to Amend Complaint [Adv. Dkt. No. 56] (the "Order on First Motion to Dismiss").

On March 20, 2017, however, the Internal Revenue Service amended its claim to reflect that taxes were only due for tax years ending in 2013 and 2014.  Claim No. 13-2 in the Main Case.  On June 14, 2017, the Internal Revenue Service further amended its claim, this time reflecting that $0.00 was due for 2013 and 2014 tax years.  Claim No. 13-3 in the Main Case.

Based on this change, the Defendants now seek summary judgment in their favor for transfers prior to November 14, 2012—transfers that would require an actual unsecured creditor to have the state law right to avoid as fraudulent.

The amendment of the Internal Revenue Service's claim certainly challenges the court's assurances that the Trustee has met his burden as to the golden creditor.  This change alone satisfies the Defendants' initial burden on their motion to put the matter into dispute.  *In re Bluberi Gaming Techs., Inc.*, 554 B.R. 841, 856 (Bankr. N.D. Ill. 2016) (Barnes, J.) ("In every matter before the court, regardless of what burdens may apply after, the movant bears the initial burden of demonstrating that it at least has a colorable claim to the relief it is requesting."); *In re Woods,* 517 B.R. 106, 116 (Bankr. N.D. Ill. 2014) (Barnes, J.) (same).  Only once that burden has been met must an opposing party defend.  *Kontos v. Manevska (In re Manevska*), 587 B.R. 517, 530 (Bankr. N.D. Ill. 2018) (Barnes, J.).

Having met that burden, the Defendants appear to proceed on summary judgment on this theory on a so-called "no evidence" theory.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In *Celotex*, the Supreme Court opened the door to such motions for summary judgment.  *Id.* at 319, 322–23 (reversing the Court of Appeals for the District of Columbia Circuit's determination that a defendant's motion for summary judgment was defective because it failed to cite to evidence to negate the plaintiff's allegations).  Specifically, the Supreme Court stated that "[i]n our view, the plain language of [Civil] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

In matters such as this, where a defendant could not prove a negative (that no golden creditor exists), it is necessary for them to proceed on such a "no evidence" theory claims on which the plaintiff bears the burden of proof at trial.  *See, e.g., Stukes v. Argoudelis (In re NCW Properties), LLC*, Case No. 18BK20215, 2023 WL 2624844, at *6–7 (Bankr. N.D. Ill. Mar. 24, 2023) (Barnes, J.).

In response, the Trustee seeks to meet his burden by identifying six creditors or classes of creditors that have such a right.  The Trustee argues that there are four creditors or classes of creditors that have the right relating to claims litigated in the Class Action—Bonnen, Class Counsel, alleged unpaid members of the Class and unknown members of the Class.  The Trustee further

---

[11]      The Defendants filed two more motions to dismiss, Adv. Dkt. Nos. 63 & 81, but did not assert any further arguments with respect to the status of a golden creditor.

18

argues that there are two creditors that have gained the state law right to avoid fraudulent transfers from postpetition actions relating to their claims—Citibank and the Internal Revenue Service.

The court will consider each of these six creditors or classes of creditors in turn.

(a)      Bonnen

The Trustee poses two alternative theories as to how Bonnen held a golden creditor claim against the Debtor as of the Petition Date.

The Trustee first argues that Bonnen's claim against the Debtor arose when the Debtor violated the RLTO in 2008 and 2009. This theory fails due to the fact that Bonnen's claim under the RLTO was released in the Settlement Agreement, which states, in pertinent part, as follows:

> Release by Class:  It is the desire of the Parties to fully, finally and forever settle, compromise and discharge disputes and claims alleged in this Litigation. Except for Class Members who submit a timely request for exclusion from the Class, upon entry of the Final Order and Dismissal in the Litigation, Plaintiff and each and every Class Member shall be bound by this Agreement and shall have recourse exclusively to the benefits, rights and remedies provided hereunder.  Each and every Class Member shall be deemed to have, and by operation of the Final Order and Dismissal shall have, fully, finally and forever released, relinquished and discharged each and all of the Released Parties[12] from any and all claims alleged in this Litigation or arising from the administration of this settlement.  Notwithstanding the foregoing, this Release is not intended to and does not affect Defendant, the property manager, building or landlord's obligations under the RLTO.

Settlement Agreement, at ¶ 4(a).  No party disputes that her claim for unpaid interest under the RLTO, as superseded by her claim under the Settlement Agreement, was paid by the Debtor and that Bonnen has not filed such a claim.

The second theory is that Bonnen holds a claim on behalf of the Class Counsel for their unpaid fees.  On November 16, 2019, Class Counsel filed Claim No. 17-1 for Bonnen on behalf of Class Counsel for such unpaid fees.  This theory fails because, by its very assertion, it stands only for the proposition that Bonnen owes Class Counsel but does nothing to provide that the Debtor was also obligated.

Another problem with this theory is that, not only was Claim No. 17-1 filed 4 years after the deadline for claims in the Main Case, but the only proof attached to Claim No. 17-1 is a rider that argues that pursuant to an alleged attached judgment (it is not attached), Bonnen is obligated to Class Counsel for the Class Counsel Award.  Assuming the alleged judgment is the Class Counsel Award, the order of the State Court awarding Class Counsel its fees only obligates the Debtor as the defendant in the Class Action to pay the Class Counsel Award.  On its face, Claim No. 17-1 does not establish Bonnen as a creditor at all, much less a golden creditor.

---

[12]      The Settlement Agreement defines the Debtor as the only Released Party.  Settlement Agreement, at § 1(o).

19

The Trustee has therefore failed to establish Bonnen as the golden creditor.

(b)      Class Counsel

If Bonnen does not hold the claim related to the Class Counsel Award, then it begs the question if Class Counsel does.  The Class was represented by two law firms, each of whom were granted fees and costs in the Class Counsel Award.  Each law firm filed a timely claim in the Main Case for their portion of the Class Counsel Award.  Claim Nos. 4-3 & 5-3, in the Main Case. Attached to each of the claims filed by Class Counsel is the Class Counsel Award.

The Class Counsel Award was made pursuant to the Settlement Agreement, which provides, in pertinent part, as follows:

> Attorney's Fees and Costs: Plaintiffs attorney fees and litigation costs shall be awarded by the Court based on a Petition by Class Counsel and consistent with RLTO § 5-12-180.  Defendant shall not object to the fee petition on the grounds that Plaintiff is not a prevailing party, but Defendant shall have the right to contest and challenge the fees and costs claimed in the Petition and to present its arguments in opposition to those fees and costs to the Court.  The fee award determined by the Court shall be final.  Neither party may appeal or request the award be otherwise reconsidered for any reason whatsoever.  The attorney's fees and costs awarded shall be paid by Defendant over six equal thirty (30) day installments to commence ten (10) days after the award is entered by the Court.

Settlement Agreement, at § 2(g)(iii).

The Class Counsel Award notes that the Debtor made numerous objections to the petition filed by Class Counsel for fees and that the state court determined the Class Counsel Award after considering all arguments.  As the claims of Class Counsel are presumptively allowed, 11 U.S.C. § 502(a), there is then, no issue with considering the Class Counsel as creditors for this purpose. What is at issue is whether the timing of such claims qualifies Class Counsel as a golden creditor.

As to that timing, Class Counsel filed the Class Action on behalf of Bonnen in 2009.  There is little doubt, then, that Class Counsel may have had a claim against Bonnen arising prior to November 14, 2012, though no party has provided an agreement or the details of an agreement governing such claim, should one exist.  Under the American Rule though, such claims were due from Bonnen, if they were due at all.  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 121 (2015) (*quoting Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–253 (2010)) ("The American Rule provides the 'basic point of reference' for awards of attorney's fees: 'Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.'").

The RLTO shifts that liability to a plaintiff only if the claims thereunder are successful. Chicago, Ill., Municipal Code, § 5-12-180 ("Except in cases of forcible entry and detainer actions, the *prevailing* plaintiff in any action arising out of a landlord's or tenant's application of the rights or remedies made available in this ordinance shall be entitled to all court costs and reasonable attorney's fees … .") (emphasis added).  While the Settlement Agreement references § 5-12-180 in creating the procedure by which Class Counsel was awarded fees, the Trustee has failed to explain how that makes Bonnen a "prevailing" plaintiff.  In a settlement, no party prevails.  *Ne. Eng'rs Fed. Credit Union v. Home Depot, Inc. (In re Home Depot, Inc.)*, 931 F.3d 1065, 1087 n.21 (11th Cir. 2019) ("It

20

would be a contradiction in terms to identify one side as the prevailing party in a settlement, especially when, as here, the defendant does not admit to liability."). Neither party admits liability under the Settlement Agreement. Further, the second sentence of the applicable section in the Settlement Agreement implies awareness by the parties of the fact Bonnen was not a prevailing party. Settlement Agreement, at § 2(g)(iii) ("Defendant shall not object to the fee petition on the grounds that Plaintiff is not a prevailing party … .").

At best then it was the contractual terms of the Settlement Agreement that caused the Debtor to be liable for the claims of Class Counsel. As noted earlier, that contract was dated November 21, 2013, and finally approved by the State Court on March 13, 2014. Further, the State Court did not award the Class Counsel fees until August 27, 2014. None of these dates is in the eligibility period of prior to November 14, 2012.

As a result, the Trustee has failed to establish Class Counsel as the golden creditor.

(c)    Unpaid Class Members

The Trustee also argues that there are members of the Class that were unpaid as of the Petition Date and that their claims date to whenever their claim under the RLTO first arose.

In this regard, it is true that on August 21, 2015, the last day to file timely claims, one of the Class Counsel purportedly on behalf of such unpaid Class members did file such a claim. Claim No. 11-2. Attached to the claim is a copy of the Settlement Agreement and a spreadsheet of many individuals whose claims under the Settlement Agreement were allegedly not paid. None of the individuals on the spreadsheet have appeared in the Main Case or any related adversary. The only party prosecuting the claims under Claim No. 11-2 is Class Counsel.

As with the claims of Class Counsel, this claim is presumptively allowed. 11 U.S.C. § 502(a). There is then, no issue with considering such allegedly unpaid Class members as creditors for this purpose. As with the claims of Class Counsel, however, what is at issue is whether the timing of such claims qualifies the allegedly unpaid Class members as a golden creditor.

As to that timing, the law does not favor the Trustee's position here. Claim No. 11-2 relies on the Settlement Agreement for such claims' existence, but the Settlement Agreement released the claims of all members in the Class. Settlement Agreement, at ¶ 4(a). This is a novation of the claims asserted in the Class Action. *In re West*, 22 F.3d 775, 777 (7th Cir. 1994) (finding that a contractual obligation arises and replaces a prior obligation when a settlement contains a release of that prior obligation). Any claim asserted in Claim No. 11-2 must then be treated as arising when the Settlement Agreement was finally approved by the state court on March 13, 2014.

Thus, as with the claims of Class Counsel, these claims did not arise in the eligibility period of prior to November 14, 2012. The alleged members of the Class that are unpaid and represented in Claim No. 11-2 are not golden creditors on which the Trustee may rely.

(d)    Unknown Class Members

The Trustee's argument that there are unknown tenants that would have claims under the RLTO against the Debtor and thus are "unknown" golden creditors is a new argument in this

proceeding, but not one that is well supported in fact or law.  The Trustee's Response only addresses this group of creditors in brief arguments that assert that the Trustee has tried to work with members of the Debtor to discover these unknown creditors, but has been unable to. Trustee's Resp., at p. 16.  It is an argument made through vague references to possible parties and no case law is offered in support of the theory that such an unknown, hypothetical party may form the basis of a section 544(b)(1) cause of action.  No claim is filed on behalf of these unknown parties.

The Trustee does not have to specifically identify a golden creditor, but nonetheless bears the burden to demonstrate that one exists.  *Essential Fin. Educ.*, 629 B.R. at 420; *accord Leonard*, 125 F.3d at 544.  As was stated earlier, for this burden to be met, the court must at the very least be reasonably assured of the existence of a qualifying creditor.

The Trustee has provided no assurances, much less reasonable ones.  This court has no reason to presume that the State Court in the proceedings before it somehow failed to capture creditors that would have and should have been included in the class.  The Trustee offers no support that such persons might exist, other than his desire for it to be so to satisfy his section 544 burdens.  That is quite simply not enough.  A plaintiff cannot rely on a purely hypothetical class of golden creditors.

The Trustee's argument with respect to unknown members of the Class existing that may serve as a golden creditor is not supported and not well taken.

(e)      Citibank

Another novel argument made by the Trustee is that the claim awarded to Citibank as part of a settlement of the Trustee's avoidance adversary against Citibank now forms the basis for Citibank to be a golden creditor.

Under section 502(h),

A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, *the same as if such claim had arisen before the date of the filing of the petition*.

11 U.S.C. § 502 (emphasis added).  A "502(h) claim" is awarded when the court avoids a transfer— the target of the avoided transfer then returns to the pot of creditors with a claim for the amount returned to the estate and receives a pro rata portion of the assets available to all creditors of a similar class.  The 502(h) claim serves the purpose of equitable distribution among creditors by avoiding prepetition transfers that may have been fraudulent or in preference of one creditor over another.

In this case, the Trustee filed an adversary against Citibank seeking to recover payments made for credit card debt that allegedly benefited an insider of the Debtor.  *Maxwell v. Citibank, N.A.*, Adv. Case No. 16ap00414 (Bankr. N.D. Ill. filed July 14, 2016) (Barnes, J.).  Rather than litigate the claim, the Trustee and Citibank reached an agreement where Citibank would repay to the bankruptcy estate a portion of the alleged fraudulent transfers in exchange for a release of all claims.

22

Citibank filed its 502(h) claim on September 19, 2022—almost 8 years after the Debtor filed the Main Case and almost 6 years after the deadline for the Trustee to file avoidance actions. Order on Trustee's Motion to Approve Compromise with Citibank, N.A. [Dkt. No. 463] (the "Citibank Settlement Order").

Section 502's express language speaks to the timing of such a claim, stating that it shall be determined "the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(h). That appears to be Congress's mechanism to ensure that such a claim not be afforded postpetition, administrative treatment.

Further, such a section 502 claim may or may not bear a relationship to the other claims that exist (the bankruptcy claim of the creditor otherwise and/or the state law rights necessary to form the basis of a section 544 golden creditor claim). To be clear, under section 544 a golden creditor must have a claim allowable under section 502 of the Bankruptcy Code. A 502(h) claim appears to satisfy this on its face. However, section 544 also requires that the creditor holding such a claim must be able to void the transfer in question under state law. As this court has stated,

> [t]he Trustee's powers under section 544(b) are conditioned on there being "an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action." *Equip. Acquisition Res.*, 742 F.3d at 746 (*quoting Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery* (*In re Cybergenics Corp.*), 226 F.3d 237, 243 (3d Cir. 2000)). A trustee stands in the shoes of an actual unsecured creditor and becomes subject to the same rights and limitations that the actual unsecured creditor would be subject to *outside of bankruptcy. See id.* at 751 … . Accordingly, "if the actual creditor could not succeed for any reason—whether due to the statute of limitations, estoppel, res judicata, waiver, or any other defense—then the trustee is similarly barred and cannot avoid the transfer." *Id.* at 746.

*Ebner v. Kaiser* (*In re Kaiser*), 525 B.R. 697, 708 (Bankr. N.D. Ill. 2014) (Barnes, J.).

A 502(h) claim, a claim created by operation of the Bankruptcy Code and not under state law, clearly does not confer standing to avoid a claim under state law.

The Trustee points to no case law to support his argument that the existence of an 502(h) claim, with nothing more, is enough to meet the requirements of section 544. The court has been unable to find any of its own accord.

The case law, rather, appears to support the Defendants' position. The case law relevant to golden creditor analysis holds that the claim has to exist as of the Petition Date. *Essential Fin. Educ.*, 629 B.R. at 420 ("Thus, to establish standing under § 544(b), the Trustee must show the existence of an actual unsecured creditor holding an allowable unsecured claim *as of the date of the petition* that could avoid the challenged transfer.") (emphasis added). Citibank's claim did not come into existence until August 24, 2022, when the court approved the settlement with the Trustee and Citibank filed Claim No. 20-1. *In re Hancock*, Case No. 22-31936-KRH, 2023 WL 1849310, at *3 (Bankr. E.D. Va. Feb. 7, 2023) ("The Court finds that the Debtor had no right to payment of the Claim on the Petition Date. While the facts giving rise to the Debtor's alleged Claim occurred prepetition, the right to assert that Claim, the cause of action itself, did not come into existence until [postpetition]."). While deemed to be a prepetition claim by operation of section 502(h) itself,

nothing appears to stand for the proposition that such a claim relates further back in time, so as to convey onto the holder of the 502(h) claim retroactive standing. The statutory language and the case law governing section 544 standing do not support the Trustee's argument.

In addition, there are good policy reasons to challenge the Trustee's argument. Allowing a trustee or debtor to create a golden creditor through section 502(h) could undermine adversary litigation. A trustee could, just as the Trustee in this case has done, proceed for years asserting against multiple defendants that one creditor is the golden creditor, then, when the existence of that creditor is reasonably questioned, negotiate a settlement with one of the defendants and thereafter claim that the 502(h) claim resulting from the settlement fixes any deficiencies under section 544. Allowing such behavior would allow gamesmanship in relation to the deadline to commence avoidance adversaries and create a perverse motivation for trustees to settle actions so as to manufacture the requirements in others.

There is also a practical consideration. As Citibank's 502(h) claim is for less than the amount that the Trustee sought to avoid[13], what forms the basis of that claim for the purpose of satisfying the state law requirements under section 544? Which transfer(s) were avoided? When did Citibank's claim arise for purposes of establishing a date for avoidance actions? Isn't the settlement and thus the later claim a novation under Seventh Circuit law, thus changing the dates claims between the parties are owed? *West*, 22 F.3d at 777. None of these practicalities were addressed by the Trustee.

A further consideration arises when the court considers that the Trustee is seeking to create a golden creditor for section 544 purposes based on postpetition actions. As this court has ruled, a party cannot defeat a golden creditor through postpetition action, such as satisfaction. *Kaiser*, 525 B.R. at 715. Given that, how can the Trustee believe he has the power to create one postpetition? Again, the golden creditor must have had the rights under nonbankruptcy law when the bankruptcy case was filed. *Id.* at 715, n.12 ("As a general rule, the rights of creditors are fixed as of the filing of the bankruptcy petition."); *Essential Fin. Educ.*, 629 B.R. at 420.

While it might be theoretically possible for the Trustee to overcome these statutory, policy and practical considerations with respect to its burden here, he has done nothing to further any of those considerations. It is the Trustee's burden to meet and it is not the place of the court to do what is in fact a burden on one of the parties.[14] Simple reliance on the existence of a 502(h) claim is not enough.

---

[13]   The Trustee's adversary proceeding against Citibank sought to avoid $1,043,123.54 in allegedly fraudulent transfers from December 2010 to November 2014, but the settlement of that adversary called for Citibank to pay $325,000.00 to the bankruptcy estate. *See* Citibank Settlement Order. Citibank then filed a claim for $325,000.00. Claim No. 20-1 in the Main Case.

[14]   *See In re Ace Track Co., Ltd.*, 556 B.R. 887, 903 (Bankr. N.D. Ill. 2016) (Barnes, J.) ("'It is not the Court's responsibility to find arguments, facts, and supporting case law for the parties.' *Sanders v. JGWPT Holdings, Inc.*, Case No. 14 C 9188, 2016 WL 4009941, at *11 (N.D. Ill. July 26, 2016). Instead, it is the 'advocate's job … to make it easy for the court to rule in his client's favor.' *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). 'Judges are not like pigs, hunting for truffles buried in briefs.' *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). 'Nor are they archaeologists searching for treasure.' *Jeralds ex rel. Jeralds v. Astrue*, 754 F.Supp.2d 984, 985 (N.D. Ill. 2010) (*citing DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th

24

The court cannot find that a 502(h) claim in and of itself serves as the golden creditor entitling the Trustee to avoid a greater number of transfers.

(f) Internal Revenue Service

As discussed above, there was a point when the Internal Revenue Service's Claim No. 13 satisfied the golden creditor requirement. That was, as previously noted, the basis of the court's prior ruling on a previous motion to dismiss. Order on First Motion to Dismiss. That claim was since amended, however. On its face, then, as amended, Claim No. 13 no longer satisfies the timing requirement of section 544 as it asserts a $0 claim only for tax years ending 2013 and 2014.

There is, however, another Internal Revenue Service claim and the Trustee seeks to rely on this claim as well. On March 7, 2022, the Internal Revenue Service filed Claim No. 19-1, which claim asserts a $20,353.21 debt due by the Debtor for the tax year ending 2013 based on the theory that the Debtor is an alter ego of Jeffrey. To be specific, the document attached to Claim No. 19-1 provides:

> This claim is a contingent claim as follows: The Trustee has brought a Section 548 action against the United States to recover the amount listed above that were paid by the debtor for the individual income tax liabilities of Jeffrey Michael for the tax years indicated above. If the Trustee prevails and the IRS must return the funds, the tax liabilities will be revived. The United States contends that the corporate debtor is liable for the tax liabilities of Daniel Michael under alter ego doctrine and/or reverse-piercing doctrine (and similarly liable for the tax liabilities of Jeffrey Michael for which a separate claim is being filed). The United States maintains that even if it is liable under Section 548 for the amounts paid, there is no waiver of sovereign immunity for interest, but interest is included above out of an abundance of caution. Priority is claimed because the 2012[15] and 2013 year returns were due (on extension) less than three years before the petition date.

Claim No. 19-1 in the Main Case.

This theory is problematic at best for multiple reasons. First, the first sentence of the rider to the claim, for example, provides that the claim was filed in the event that the Trustee's fraudulent transfer action against the Internal Revenue Service for taxes paid for Jeffrey is successful. *See Maxwell v. United States of America*, Adv. Case No. 16ap00465 (Bankr. N.D. Ill. filed July 15, 2016) (Barnes, J.). There has been no resolution of that adversary proceeding and thus, as of the date of this decision, there is no recovery by the Trustee that may give rise to any claim by the Internal Revenue Service against the bankruptcy estate. Further, for the reasons just detailed by the court, any claim for avoided transfers would be under section 502(h) and would not provide the Trustee with standing for purposes of section 544.

Second, nothing in the claim as asserted stands for the proposition that the Debtor is liable for the payment of its principals' taxes. While the Internal Revenue Service might succeed on an

---

Cir. 1999)); *see also Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F.Supp.2d 503, 508 (N.D. Ill. 2011) (summarizing the foregoing).").

[15] While this explanation references taxes due for years 2012 and 2013, the form attached to Claim No. 19-1 indicates the claim is for $20,000.00 plus interest for the tax period ending 12/31/2013.

alter ego theory, that is not properly before the court at this time. Nor does it need to be. Claim No. 19-1 itself, on its face, shows that the claim is for taxes due for the tax year ending December 31, 2013. Without more, the existence of a claim for taxes for 2013 does not establish that the Internal Revenue Service is a creditor capable of satisfying the requirements of section 544 for transfers prior to November 14, 2012.

Unfortunately for the Trustee, the court can find no unsecured creditor that would be entitled to avoid transfers of the Debtor that arose prior to November 14, 2012, as of the Petition Date. The court will therefore enter summary judgment in favor of Daniel, Martha and Jeff with respect to transfers prior to November 14, 2012.

4.    *Counts I and XX*

Finally, the Defendants also request summary judgment on Counts I (Breach of Management Agreements)[16] and XX (Equitable Relief Piercing the Veil) of the Complaint. Each of these Counts seeks its respective relief against the Horizon Group Companies in their entirety. As noted above, the Trustee defines the Horizon Group Companies to be the series of family trusts and ownership entities in place over the Properties in which the units are placed (each property with its own specific limited liability direct owner).

The Defendants argues that five of Horizon Group Companies, namely Horizon Group VIII, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC, and Horizon Group XXIV, LLC, cannot be liable under Counts I and XX, as for Horizon Group VIII, LLC, and Horizon Group XXIII, LLC, they did not and do not own property in the City of Chicago and, as for Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC, and Horizon Group XXIV, LLC, these entities were created after June 24, 2009, and thus cannot be culpable for acts on or before that date. The Defendants further argue that alter ego theory asserted in Count XX cannot be used to reimpose liability on released claims. *SMS Assist L.L.C. v. E. Coast Lot & Pavement Maint. Corp.*, 913 F. Supp. 2d 612, 632 (N.D. Ill. 2012).

The Trustee, in response, argues that, regardless of direct liability under the RLTO, any Horizon Group Company that later became obligated under the Management Agreement would be responsible to reimburse expenses under Count I. *Cf. Itg Brands v. Reynolds Am.* , Case No. 2017-0129-LWW, 2022 WL 4678868, *16 (Del. Ch. Sep. 30, 2022) (a party may, under Delaware law, through indirect or expansive agreements, contractually agree to assume liability that that party would not otherwise be subject to). The Trustee counters the Count XX argument by stating that the Stipulation cannot release the Horizon Group Companies have been complicit in the Debtor's attempts to avoid compliance with the Stipulation.

The Defendants in turn mistakenly argue that the Trustee has failed to respond to their arguments and thus they should succeed, mistaking both the facts (the Trustee did in fact respond) and the law on this point. *See, e.g., Heinemann v. Satterberg,* 731 F.3d 914, 916–17 (9th Cir. 2013) (discussing in great detail the history of revisions to Civil Rule 56 and advisory notes to the same and concluding that Civil Rule 56 requires the court inquire into merits on unopposed summary

---

[16]    On a different theory than was discussed as to Count I, *supra*.

judgment motions).  Summary judgment involves a critical inquiry of the court into the facts, whether or not summary judgment is opposed.

With that in mind, the court will consider each of the arguments raised here by Defendants as to Count I first, and then as to Count XX.

(a)      Breach of the Management Agreement – Count I

The Trustee is not incorrect as to his assertions regarding contractual assumption, though his reliance on Delaware contract law is misplaced.  The Management Agreement is expressly governed by Illinois law.  Management Agreement, at § 16.9.  Under Illinois law, the court can find no principled reason why the Costs Provision could not handle expenses that predate the Management Agreement.  The Costs Provisions expressly covers "*all* costs, expenses and fees." There is no temporal limitation or sequencing.  On the other hand, retroactive application of contract provisions does not appear to be the sort of contractual term the court should imply.

The Management Agreement, as amended and restated on January 1, 2008, is signed by Daniel on behalf of a number of the Horizon Group Companies, including Horizon Group VIII, LLC, Horizon Group XXI, LLC, and Horizon Group XXII, LLC.  *See* Defendants' Motion, Exh. C. On that date, the Management Agreement was not, however, signed on behalf of either Horizon Group XXIII, LLC, or Horizon Group XXIV, LLC.  But, as later amended, these entities did in fact join the Management Agreement.  *See* First Amendment to Second Amended & Restated Management Agreement, Compl., at Exh. 6.

Neither party advances this issue in any meaningful way.  Further, the Trustee's phrasing of this argument is more nuanced than the Defendants give credit.  The Trustee implies both that the parties to the Management Agreement might have agreed to become liable to these existing and known costs when agreeing to be bound and that earlier costs might be considered recurring and not retroactive under the right set of circumstances.  In that regard, a relatively recent decision from the District Court is instructive.  *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 729–30 (N.D. Ill. 2017).  In *Northern Illinois Gas*, the District Court observed that "[w]hen conduct alleged in a complaint 'straddles' the effective date of a governing statute or ordinance, '[a] retroactivity question cannot be decided at the pleading stage.'"  *Id.* at 729 (*quoting Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 617 (7th Cir. 2007)).  As in *Northern Illinois Gas*, when factual allegations of liability straddle the contract formation date, the question of retroactive application is inapposite at the summary judgment stage.  *Id.* at 730.

As the agreement is silent and there exists interpretations in favor of either party, what this comes down to is this:  What did the parties intend?  Illinois contract law is about that intent. *Gallagher*, 226 Ill. 2d at 232.  That intent is unclear and, thus, the Defendants have failed to make a showing that summary judgment is appropriate.

(b)      Equitable Relief/Piercing the Veil – Count XX

In the alternative, the Defendants argue that none of Horizon Group VIII, LLC, Horizon Group XXI, LLC, Horizon Group XXII, LLC, Horizon Group XXIII, LLC, and Horizon Group XXIV, LLC, can be held liable on Count XX of the Complaint as they did not exist at the time of

27

the actions in question or, in some instances, did not own or manage property in the City of Chicago.

Both arguments fail to reflect the nature of veil piercing.  "When a party seeks to pierce the corporate veil, the law of the state of incorporation governs.  *Fogel v. Specialty Indus. II, LLC* (*In re Palmieri*), Case No. AP 22 A 00177, 2023 WL 3454703, at *6 (Bankr. N.D. Ill. May 15, 2023) (*citing to Paloian v. Geneva Seal, Inc.* (*In re Canopy Fin., Inc.*), 477 B.R. 696, 702 (N.D. Ill. 2012)).  Here, each of the Horizon Group Companies are Illinois limited liability companies.  Compl., at ¶¶ 21–41.  Illinois law thus applies.

"Illinois does not doggedly adhere to the corporate form whenever doing so would sanction an injustice perpetuated *by* a third party."  *In re Wolf*, 644 B.R. 725, 751 (N.D. Ill. 2022) (emphasis in original), *reconsideration denied,* Case No. 18 C 07952, 2022 WL 19766903 (N.D. Ill. Dec. 8, 2022).  The Illinois courts have established clear requirements for veil piercing:

> A corporation is an entity separate and distinct from its shareholders, directors, and officers.  *In re Rehabilitation of Centaur Ins. Co.,* 158 Ill.2d 166, 172, 198 Ill. Dec. 404, 632 N.E.2d 1015 (1994).  Indeed, the primary purpose of corporations is to insulate stockholders from unlimited liability.  *Peetoom,* 334 Ill. App. 3d at 526, 268 Ill. Dec. 305, 778 N.E.2d 291 [*Peetoom v. Swanson*, 778 N.E.2d (Ill. App. Ct. 2002)].  Courts may pierce the corporate veil, however, where the corporation is so organized and controlled by another entity that maintaining the fiction of separate identities would sanction a fraud or promote injustice.  *Id.* at 527, 268 Ill. Dec. 305, 778 N.E.2d 291.  A party seeking to pierce the corporate veil must make a substantial showing that one corporation is a dummy or sham for another.  *In re Estate of Wallen,* 262 Ill. App. 3d 61, 68, 199 Ill. Dec. 359, 633 N.E.2d 1350 (1994).
>
> ¶ 13 Illinois courts will pierce the corporate veil "where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances."  *Tower Investors,* 371 Ill. App. 3d at 1033–34, 309 Ill. Dec. 686, 864 N.E.2d 927 [*Tower Invs., LLC v. 111 East Chestnut Consultants, Inc.,* 864 N.E.2d 927 (Ill. App. Ct. 2007)].  To overcome a section 2–615 motion to dismiss, the party seeking to pierce the corporate veil must adequately plead facts to satisfy both of these prongs.  *South Side Bank v. T.S.B. Corp.,* 94 Ill. App. 3d 1006, 1010, 50 Ill. Dec. 369, 419 N.E.2d 477 (1981); *Divco–Wayne Sales Fin. Corp. v. Martin Vehicle Sales, Inc.,* 45 Ill. App. 2d 192, 197, 195 N.E.2d 287 (1963).

*Buckley v. Abuzir*, 8 N.E.3d 1166, 1170 (Ill. App. Ct. 2014).  As is clear from the foregoing, these requirements are intensely factual and would rarely lend themselves to a determination on summary judgment.

The Defendants, however, do not challenge the elements of the Trustee's veil-piercing claim.  Rather, the Defendants argue that such a claim is unavailable to entities that were not in existence at the time of the underlying acts or independently liable for the actions.

28

The latter misapprehends the nature of the veil-piercing claims.  It is not necessary to show that an alter ego of the Debtor was equally culpable with the Debtor.  Were that the requirement, there would be no need for alter ego theory at all.  The defendant would be directly liable.  Alter ego is not, in fact, a cause of action at all.  *Abuzir*, 8 N.E.3d at 1169 ("Piercing the corporate veil is not a cause of action but, rather, a means of imposing liability in an underlying cause of action. *Peetoom v. Swanson,* 334 Ill. App. 3d 523, 527, 268 Ill. Dec. 305, 778 N.E.2d 291 (2002).").

As a means of imposing liability, there is no principled reason why an alter ego of a liable party could not be liable as an alter ego, even if created after the acts in question.  The Defendants cite to no case law to the contrary and as a result, they are not entitled to summary judgment on this theory.

C.      The Trustee's Motion

The Trustee's Motion, on the other hand, does not seek summary judgment specific to the Counts, but rather seeks a finding that, as a matter of the Sale Order in the Debtor's bankruptcy case and thus the law of the case governing this matter, the Debtor's Management Agreement had little or no value to third-party purchasers during the four years preceding the Debtor filing for bankruptcy.

As a preliminary matter, the Trustee's request is based almost entirely on the positions taken by the Debtor in the Sale Motion, not the contents of the Sale Order itself or the court's statements made in conjunction therewith.

It is true that the court concluded in the Sale Order that the Management Agreement was of little to no value at that time.  Sale Order, at ¶ G.  The court, however, made no finding regarding the value of the Management Agreement at any time other than that.  The Trustee is asking the court to infer that the Management Agreement was worth little to no value prepetition because it was materially the same as the Management Agreement the court deemed without value postpetition.

The Defendants argue that the Trustee's reliance on the Sale Order is misplaced.  The Defendants assert that the court cannot determine the prepetition value of an asset based on its postpetition value at the Sale Order and that it is improper for the court to apply its narrow finding at the Sale Order to the value of the Management Agreement prepetition (which they allege was high given their alleged going-concern value of the Debtor).

The court agrees, but not because of any intrinsic value imputed by either party.

The issue of the Management Agreement prepetition has not been litigated and therefore remains a genuine issue of material fact that exists, making summary judgment inappropriate.  This court's determinations with respect to the Sale Order do not meet the requirements of *res judicata*, collateral estoppel or judicial estoppel.

1.      Res Judicata

The Trustee first argues that the court's determinations regarding the Sale Order are entitled to *res judicata* effect.

There are three elements that must be established in order for *res judicata* to apply. *People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 177 (7th Cir. 1995). There must be (i) a final judgment on the merits in an earlier action, (ii) an identity of parties or privies in both the earlier and later suit, and (iii) an identity of the cause of action in both the earlier and later suit. *In re J.S. II, L.L.C.*, 389 B.R. 570, 584 (Bankr. N.D. Ill. 2008) (Cox, J.) (*citing to La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 907 (7th Cir. 1990)).

As to the first, in the Seventh Circuit a sale order entered by a bankruptcy court is a final judgment on the merits for the purposes of *res judicata*. *J.S. II,* 389 B.R. at 584 (*citing to In re Met–L– Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988)). Here, this court entered the Sale Order on April 1, 2015. As the Sale Order serves as a final judgment on the merits, the first element is satisfied.

As to the second, for parties to be in privity with each other, the party that the Trustee is seeking *res judicata* against must have been a party in the earlier proceeding. The parties in privity must have a "sufficiently close identity of interests." *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993). There is no reasonable dispute that, as a debtor-in-possession under chapter 11 of the Bankruptcy Code, the Debtor was a participant in the Sale Order's process. It can be argued that those Defendants in control of the Debtor during that time therefore were a party to the Debtor's actions in the Main Case. This is not, however, a foregone conclusion and would apply only to those Defendants shown to be in control of the Debtor. This element is, therefore, problematic at best.

Even presuming for the sake of argument that the second element has been satisfied, the third element has not. *Res judicata* bars the relitigating of issues which were raised, or could have been raised, in prior actions that led to a judgment on the merits. *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 853 (7th Cir. 1985) (*citing to Harper Plastics, Inc. v. Amoco Chemicals Corp.*, 657 F.2d 939, 945 (7th Cir. 1981); *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir. 1982)). An identity of the cause of action in both the earlier and later suits must consist of a "'single core of operative facts' which give rise to a remedy." *Mandarino v. Pollard*, 718 F.2d 845, 849 (7th Cir. 1983) (*quoting Alexander v. Chicago Park Dist.*, 773 F.2d 850, 854 (7th Cir. 1985)). In this case, the Trustee seeks to use one narrow finding from the Sale Order and the representations made within that order or at the hearings thereon to bar the later litigation of a related, though different factual question. Neither the finding nor the broader issue the Trustee wishes to find established was litigated before the court and this factual issue was not raised before the court.

Because there is no identity of the issues raised (or that should have been raised) between the Sale Order and this Adversary Proceeding and such issues were not, in any event, claims to which *res judicata* would apply, the Trustee is unentitled to rely on *res judicata*.

2.      *Collateral Estoppel*

The second theory the Trustee relies on is collateral estoppel.

Under collateral estoppel, the Defendants would be estopped from challenging the value of the Management Agreement prepetition because the court found the Management Agreement postpetition to be of little or no value. For similar reasons, this theory fails.

30

For collateral estoppel to apply, four elements must be satisfied: (i) the party who is being estopped must have been fully represented in the previous case; (ii) the issue sought to be estopped must be the same issue used in previous case; (iii) the issue must have been litigated; and (iv) the court's conclusion on the issue must have been essential to the final judgment in the case. *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007) (*citing Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994)).

As to the first element, the Defendants were fully represented during the bankruptcy process in the Main Case. The first element is satisfied.

Second, the issue sought to be estopped must be the same issue used in previous case. True, the Debtor represented in the Sale Motion that the Management Agreement was of little to no value to third parties because the agreements can be terminated on short notice. Sale Motion, at ¶ 9. That, however, was only one element of for the court's consideration at that time. In a larger context, the court was required to determine not whether the Management Agreement had no value, but rather whether the consideration paid under the sale was reasonable. Assessing a nominal value to one asset being sold in the context of a bankruptcy sale of other assets is not the same thing as determining whether the same asset, if sold alone or outside the context of bankruptcy is valueless. As a result, the issues in the Main Case and this Adversary Proceeding are different. This element is not satisfied and that is a fatal flaw in the Trustee's reliance on collateral estoppel.

Because collateral estoppel fails at the second element, there is no reason to consider the remainder. As a result, the court turns to the Trustee's third and final legal theory.

3.   *Judicial Estoppel*

The final legal theory relied on by the Trustee is judicial estoppel. Judicial estoppel is applicable to situations where a party who prevailed in a prior proceeding on one ground cannot later change that same ground in a different proceeding. *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 495 (7th Cir. 2011). Judicial estoppel is intended to protect the courts from "chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992) (*citing to Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)).

Here the Trustee is seeking to have the Defendants estopped from asserting that the value of the Management Agreement is different pre and postpetition after the Debtor already represented that the Management Agreement was without value based on the terms of the Management Agreement.

There are three elements that need be satisfied for judicial estoppel to apply: (i) the party who estoppel is sought against must have won a prior case on their position; (ii) the facts at issue must be the same in both cases; and (iii) and the later position must be clearly inconsistent with the earlier position. *Levinson*, 969 F.2d at 265.

As to the first element, in the previous case, the Debtor successfully brought a motion to sell its assets free and clear. In the Sale Motion, the Debtor represented that the Management Agreement was of little to no value for third-party purchasers because they were terminable on short notice by either party. Sale Motion, at ¶ 9. While that assertion was adopted by the court in the Sale

31

Order, Sale Order, at ¶ G, the matter was neither litigated nor was the Debtor "successful" on this position.

The second element is equally problematic. While the factual components (the ease of termination of the agreements) are the same, the facts (the value of the agreements) are not. A determination of value at different points in time and under different circumstances cannot be considered the same issue in this regard.

The third and final element is whether the Defendants are now arguing a different position than they did as the Debtor when filing their Sale Motion. As noted with respect to *res judicata*, it is difficult to immediately assume an identity between the Debtor and those Defendants who managed the Debtor for these purposes. True, the Debtor attributed the little or no value of the Management Agreement because of the provision contained therein which allowed either party to terminate the agreement upon short notice. Sale Motion, at ¶ 9. It is, however, the Trustee that stands in the shoes of the Debtor at this time and the Trustee that would be estopped from taking a different position. The Trustee is not acting inconsistently with those assertions.

The Defendants are not, however, without a final determination otherwise, the same as the company some of them managed. Thus even if the third element was satisfied, without more, it would not without apply to the Defendants who played no role in managing the Debtor. Consequently, the court cannot find that the Defendants are estopped from arguing that the prepetition value of the Management Agreement was anything other than little or no value to third-party purchasers.

CONCLUSION

For the foregoing, the Defendants' Motion is well taken as to transfers that occurred prior to November 14, 2012, under Count X and Count XVI. The court will enter summary judgment in favor of Daniel and Martha on Count X and in favor of Jeffrey on Count XVI with respect to transfers that occurred prior to November 14, 2012. No other party is entitled to summary judgment on these counts. As to the remaining Counts on which the Defendants seek summary judgment, they are not entitled to summary judgment thereon.

Finally, as the Trustee's Motion, the arguments contained therein are not well taken and it will be denied in its entirety. A separate order to that effect will be entered concurrently herewith.

Dated: July 18, 2023                    ENTERED:

_____
Timothy A. Barnes, Judge
United States Bankruptcy Court